Arthur W. Coviello (SBN 291226)
arthur.coviello@wilmerhale.com
WILMER CUTLER PICKERING
HALE AND DORR LLP
2600 El Camino Real, Suite 400
Palo Alto, California 94306
Telephone: (650) 858-6069

Michael J. Summersgill (*pro hac vice*)
michael.summersgill@wilmerhale.com
WILMER CUTLER PICKERING
HALE AND DORR LLP
60 State Street
Boston, Massachusetts 02109
Telephone: (617) 526-6000

[Additional Counsel Listed in Signature Block]

*Attorneys for Plaintiff and Counterclaim-Defendant Akamai Technologies, Inc.*

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| AKAMAI TECHNOLOGIES, INC.,<br><br>Plaintiff and Counterclaim Defendant,<br><br>v.<br><br>MEDIAPOINTE, INC. and AMHC, INC.,<br><br>Defendants and Counterclaimant. | Case No. 2:22-cv-06233-MCS-SHKx<br><br>**AKAMAI TECHNOLOGIES, INC.'S MEMORANDUM AND POINTS OF AUTHORITIES IN SUPPORT OF ITS MOTION TO STRIKE MEDIAPOINTE'S UNTIMELY INFRINGEMENT CONTENTIONS FROM ITS EXPERT'S REPORT**<br><br>Hearing Date: Nov. 20, 2023<br>Time: 9:00 a.m.<br>Location: Courtroom 7C, 7th Floor |

## TABLE OF CONTENTS

I. INTRODUCTION .......... 1
II. STATEMENT OF FACTS .......... 3
A. The Court's Scheduling Orders .......... 3
B. The Asserted '195 Patent .......... 3
C. MediaPointe's Final Infringement Contentions Relied on Akamai's GTM As The Alleged Management Center .......... 4
D. MediaPointe's Expert's Report Abandoned Its GTM Allegations And Offered Multiple New Infringement Theories .......... 5
E. The Documents MediaPointe's Expert Cited for Its New Infringement Theories Were Produced Early in Discovery .......... 10
III. LEGAL STANDARDS .......... 12
IV. ARGUMENT .......... 13
A. MediaPointe's New Infringement Contentions Are Untimely .......... 13
B. There Is No Good Cause for MediaPointe's Untimely Contentions .......... 15
C. Akamai Has Been Prejudiced by MediaPointe's Untimely Contentions .......... 17
V. CONCLUSION .......... 18

# TABLE OF AUTHORITIES

Page(s)

**Federal Cases**

*B-K Lighting, Inc. v. Vision3 Lighting*, 930 F. Supp. 2d 1102 (C.D. Cal. 2013) ............ 15

*Cal. Inst. of Tech. v. Hughes Commc'ns, Inc.*, 2:13-cv-07245, 2015 WL 11120845 (C.D. Cal. Apr. 13, 2015) ............ 15, 16, 18

*Facet Techs., LLC v. LifesSan, Inc.*, No. 22-CV-01717-MCS-MARx, 2023 WL 5504954 (C.D. Cal. June 7, 2023) ............ *passim*

*O2 Micro Int'l Ltd. v. Monolithic Power Sys., Inc.*, 467 F.3d 1355 (Fed. Cir. 2006) ............ 2, 12

*Polaris PowerLED Techs., LLC v. VIZIO, Inc.*, No. 18-CV-1571, 2020 WL 4258663 (C.D. Cal. May 14, 2020) ............ 15, 16

**Other Authorities**

Fed. R. Civ. P. 16(f) ............ 3, 12

Fed. R. Civ. P. 37 ............ 12

# I. INTRODUCTION

In its June 22, 2023 Final Infringement Contentions ("FICs"), MediaPointe presented what was supposed to be its final infringement theory. Two months later, in the August 21, 2023 report of its expert Dr. Aviel Rubin, however, MediaPointe recognized that its "final" infringement theory was fundamentally flawed and abandoned it in favor of new infringement theories for multiple asserted patent claim requirements based on Akamai's Mapping System (known as "Mapper"). MediaPointe's attempt to present entirely new infringement theories for the first time in its expert's report violates the Court's Scheduling Order and its discovery obligations in this case. Akamai therefore respectfully moves to strike MediaPointe's untimely new infringement theories.

***First***, for multiple key claim limitations, MediaPointe's expert relied on new infringement arguments, different documents, and different source code than MediaPointe identified in its FICs. *See infra* Section II.D-E. Specifically, all the asserted '195 patent claims require a "management center" that receives a "request for media content from a first client" and directs the first client to a "selected node" that then relays the requested content stream from a content provider to the first client. Ex. 1 ['195 patent] 17:41-53.[1] In its Preliminary Infringement Contentions ("PICs") and its FICs, MediaPointe alleged that the claimed "management center" was Akamai's Global Traffic Management ("GTM") product. Ex. 2 ['195 FIC] at 4; Ex. 3 ['195 PIC] at 4. In its expert's report, however, MediaPointe abandoned its GTM allegations: "***my report does not identify GTM as an infringing product***." Ex. 4 [Rubin Opening Report] ¶ 112 n.9. Instead, MediaPointe and its expert offered multiple new infringement theories based on a new assertion that Akamai's

[1] "Ex." refers to exhibits attached to the Coviello Declaration. All emphasis herein is added.

"Mapper" allegedly functions as the claimed "management center" in Akamai's Content Delivery Network ("CDN"). *Id.* ¶ 167.

***Second***, MediaPointe had no good cause to disclose its new infringement contentions for Akamai's Mapper for the first time in its expert report. *See Facet Techs., LLC v. LifesSan, Inc.*, No. 22-CV-01717-MCS-MARx, 2023 WL 5504954, at *2-3 (C.D. Cal. June 7, 2023) (striking untimely invalidity contentions for failure to show good cause to amend). In fact, by February 2023—***four months before MediaPointe's FICs***—Akamai had produced documents cited by MediaPointe's expert for each of its new infringement theories. *See* Section II.E. MediaPointe thus has no basis to argue that it disclosed its new theory soon after it discovered some new evidence; instead, after realizing that its FICs had no basis, MediaPointe merely shifted to a new—and equally baseless—theory of infringement.

***Third***, MediaPointe's untimely disclosure of new infringement theories is not harmless but instead significantly prejudiced Akamai's opportunity to investigate and respond to MediaPointe's infringement allegations during fact discovery. Indeed, for ***eight months***—from MediaPointe's PICs on December 23, 2022 to its expert's report on August 21, 2023—Akamai devoted significant resources responding to MediaPointe's allegations that Akamai's GTM was the claimed management center. Then, after the close of fact discovery, MediaPointe dropped all its GTM allegations and substituted new allegations based on Akamai's Mapper—depriving Akamai of any opportunity to take fact discovery on MediaPointe's new theories.

Accordingly, MediaPointe should be precluded from relying on its untimely infringement theories. *See O2 Micro Int'l Ltd. v. Monolithic Power Sys., Inc.*, 467 F.3d 1355, 1363 (Fed. Cir. 2006) ("The court may impose any just sanction for the failure to obey a scheduling order, including refusing to allow the disobedient party to support or oppose designated claims or defenses, or prohibiting that party from

introducing designated matters in evidence."); Fed. R. Civ. P. 16(f), 37(b)(2)(A), and 37(c)(1).

## II. STATEMENT OF FACTS

### A. The Court's Scheduling Orders

On December 22, 2022, the Court entered the parties' stipulated Scheduling Order providing that MediaPointe was required to serve its PICs on December 23, 2022 and its FICs on June 22, 2023. Dkt. 58 (Scheduling Order). The Court also set August 21, 2023 as the deadline for MediaPointe's opening expert report. Dkt. 56 (Order Re: Jury Trial).

### B. The Asserted '195 Patent

MediaPointe asserts claims 1, 3, 4, 6, and 7 of the '195 patent. The '195 patent is directed to a so-called "Intelligent Distribution Network" ("IDN") that purportedly addresses the problem of "inefficient routing" of streaming content over the Internet to clients. Ex. 1 ['195 patent] at Abstract, 2:53-65. To address this problem, the claimed method of the '195 patent includes a "management center" that receives a "request for media content from a first client" and directs the first client to a "selected node" that relays the requested content stream from a content provider to the first client. *Id.* 17:42-53. For purposes of this motion, the relevant requirements of asserted claim 1 of the '195 patent are as follows:

> 1[a] ***receiving an initial request for media content from a first client, the request being received by a management center***,
>
> 1[b] directing the first client to a node that is selected to relay a content stream from a content provider to the first client by using a mapping engine that maps trace routes between the management center, the node, and the first client, ***the first client being directed to the node by the management center***.
>
> …

> 1[d] replicating the content stream for other clients during the relaying of the content stream at the selected node, in response to Subsequent requests for the media content from the other clients, ***the other clients connected to the selected node based on an identification that the selected node is already relaying the content stream from the content provider to the first client***.

Ex. 1 ['195 patent] 17:42-60. The remaining asserted claims (3, 4, 6, and 7) each depend on claim 1 and thus include these same requirements.

### C. MediaPointe's Final Infringement Contentions Relied on Akamai's GTM As The Alleged Management Center

In MediaPointe's FICs, it alleged that Akamai's GTM product constituted the alleged Management Center and that certain GTM functionality met other key claim requirements. The chart below summarizes relevant excerpts from MediaPointe's FICs that relied on GTM:

| Claim Element | Excerpts of MediaPointe's FICs |
|---|---|
| 1[a] receiving an initial request for media content from a first client, ***the request being received <u>by a management center</u>*** | • "Akamai's Global Traffic Management ***('<u>GTM</u>') functions as the management center***." Ex. 2 ['195 FIC] '195 Claim Chart, at 4. |
| 1[b] directing the first client to a node that is selected to relay a content stream from a content provider to the first client by using a mapping engine that ***<u>maps trace routes</u>*** between the management center, the node, | • "The ***<u>GTM</u>*** uses the MapMaker as a 'mapping engine' to ***map GeoTrees (i.e., '<u>trace routes</u>')*** between the node (Akamai's Ghost or edge servers) and the client requesting the stream." *Id.* at 15.<br>• "The Akamai ***<u>GTM</u> ultimately directs the client, using its GeoTrees, LLMaps, and*** |

| Claim Element | Excerpts of MediaPointe's FICs |
|---|---|
| and the first client, ***the first client being <u>directed to the node by the management center</u>*** | ***IP Ping Maps, <u>to a specific node</u> that will relay the requested content stream***." *Id.* at 16. |
| 1[d] replicating the content stream for other clients during the relaying of the content stream at the selected node, in response to subsequent requests for the media content from the other clients, ***the other clients connected to the selected node <u>based on an identification that the selected node is already relaying the content stream</u>*** from the content provider to the first client | • "When receiving a request from a client for streamed content, the ***<u>Akamai GTM</u>*** directs its Ghost edge servers (i.e., 'the selected node[s]') to check their caches (i.e., '***an identification that the selected node is <u>already relaying the content</u> stream from the content provider***') to see if that particular content stream has already been requested by a previous client (i.e., 'the first client')." *Id.* at 29. |

## D. MediaPointe's Expert's Report Abandoned Its GTM Allegations And Offered Multiple New Infringement Theories

In the report of its expert, Dr. Rubin, MediaPointe expressly abandoned its infringement theories relying on Akamai's GTM product:

> Though Akamai's publicly available product brief shows that GTM performed many of the same steps that MediaPointe accuses Akamai's "Mapper" system of infringing, ***it is my understanding that <u>GTM is not a content delivery product</u>***. *See* AKMP_00007332, at 7333. ***<u>Accordingly, my report does not identify GTM as an infringing</u>***

***product*** even though GTM is also widely used in conjunction with Akamai's content delivery products.

Ex. 4 [Rubin Opening Report] ¶ 112 n.9; Ex. 5 [Rubin Dep.] 267:9-15.

In place of MediaPointe's GTM infringement theory, MediaPointe's expert—for the first time—substituted new infringement theories for multiple different claim elements based on Akamai's Mapper that had not been disclosed in MediaPointe's PICs or FICs, as summarized in the chart below:

| Claim Element | New Infringement Theories in Dr. Rubin's Report and Deposition |
| --- | --- |
| 1[a] receiving an initial request for media content from a first client, ***the request being received by a management center*** | • ***Mapper serves as the 'management center' in Akamai's platform***." Ex. 4 [Rubin Opening Report] at ¶ 167.<br>• "***Akamai's mapping system, known as 'Mapper,' receives the request for content.***" *Id.*<br>• "The request for content is ***initiated by a DNS query***." *Id.* at ¶ 168.<br>• "In a vacuum, a DNS query does not necessarily represent a request for content. But ***when that DNS query is part of the request for content and results from the request for content, then it is a request for content to the mapper***." Ex. 5 [Rubin Dep.] at 195:19-23. |
| 1[b] directing the first client to a node that is selected to relay a | • "In ***mapping trace routes*** to the 'client,' Akamai specifically maps traceroutes to |

| **Claim Element** | **New Infringement Theories in Dr. Rubin's Report and Deposition** |
|---|---|
| content stream from a content provider to the first client by using a mapping engine that maps trace routes between the management center, the node, and the first client, ***the first client being directed to the node by the management center*** | ***the client's DNS resolver***. ***The user's DNS resolver approximates the end user's location***." Ex. 4 [Rubin Opening Report] at ¶ 178.[2]<br>• "When a user's DNS resolver does not sufficiently approximate the end user's location, Akamai uses ***EDNS0-client-subnet*** information." *Id*. at ¶¶ 179-183.[3]<br>• MediaPointe's expert also cited an entirely new set of source code files that |

[2] The client's "DNS resolver" is a third-party server that responds to DNS queries from a client. *See* Ex. 5 [Rubin Dep.] 208:3-10 ("Q … The first step is that the end user sends a DNS query to the ISP DNS server, correct? A Yes. Q And that's labeled in step 1 as the client resolver, correct? A Yes."). As discussed in Akamai's accompanying motion for summary judgment, a DNS query is a request for an IP address for a server, not a request for content. *Id*. 196:9-15 ("When a client computer sends a DNS query, a DNS server returns an IP address" and an "IP address is not the content."); 174:2-5 (A "***DNS query itself is not the request for content described in the '195 patent***.")

[3] An EDNS client subnet is a network in which the client resides; specifically, it refers to using a "partial IP address" that does not identify the client itself. Ex. 4 [Rubin Opening Report] ¶ 181. EDNS refers to an industry standard defined and published by the Internet Engineering Task Force in 2016. *Id*.

| Claim Element | New Infringement Theories in Dr. Rubin's Report and Deposition |
|---|---|
| | were not cited in MediaPointe's FICs. Ex. 4 [Rubin Dep.] at 273:22-274:1. |
| 1[d] replicating the content stream for other clients during the relaying of the content stream at the selected node, in response to subsequent requests for the media content from the other clients, ***the other clients connected to the selected node <u>based on an identification that the selected node is already relaying the content stream</u>*** from the content provider to the first client | • "Upon receiving a subsequent client request for a continuous stream of data, Akamai's ***<u>Mapper</u> will identify and confirm if a node <u>is already relaying the continuous stream of data</u>*** to a first client." Ex. 4 [Rubin Opening Report] at ¶ 220.<br>• "***<u>Akamai's 'consistent hashing' caching protocol</u>***, described in 'Consistent Hashing and Random Trees: Distributed Caching Protocols for Relieving Hot Spots on the World Wide Web,'[] ensures that clients are directed to edge servers that are ***<u>more likely to have already cached the content</u>*** they are requesting. Considering this, it is my opinion that the overwhelming majority of subsequent requests for content ***<u>already being streamed</u>*** to a first client would result in subsequent clients (located within the same geographic region as the first) receiving a replicated stream from the |

| **Claim Element** | **New Infringement Theories in Dr. Rubin's Report and Deposition** |
|---|---|
| | same edge server that is serving a first client." *Id*. at ¶ 327; *see also id.* ¶ 223.[4] |

Despite the fact that all of the source code files MediaPointe's expert relied upon in his report for claim element 1[b] had been produced in February 2023, months before MediaPointe submitted its FICs, MediaPointe's expert admitted that ***none*** of the files he cited for claim 1[b] were cited in MediaPointe's FICs:

Q Yeah, so are you aware that none of the source code files cited in your report for claim 1b were cited in MediaPointe's final infringement contentions for 1b?

***A <u>It appears that way.</u>***

Ex. 5 [Rubin Dep.] 273:22-274:1.

The fact that MediaPointe disclosed these new infringement theories in Dr. Rubin's report is particularly striking given his admissions that he had reviewed and approved MediaPointe's FICs relying on GTM as the claimed "management center," only to abandon those same theories two months later in his expert report:

Q And at the time that MediaPointe's final infringement contentions were submitted, ***you approved this allegation that Akamai's GTM acted as the management center and received a request for media content***, correct?

[4] "Consistent hashing" is a technology that Akamai's founders developed in the 1990s for allocating load among servers in a content delivery network. Ex. 4 [Rubin Opening Report] ¶ 223, 327; Ex. 6 [AK-MP_00003881] (Karger et al., Consistent Hashing and Random Trees, 1997).

A ***Yes**. At that time, that's what I thought*.

Q Right. ***In your expert report in this case, you do not contend that Akamai's GTM functions as the management center or receives a request for content***, correct?

A ***That's right***.

Ex. 5 [Rubin Dep.] 267:9-20.

### E. The Documents MediaPointe's Expert Cited for Its New Infringement Theories Were Produced Early in Discovery

The documents that MediaPointe's expert relied on in his report for MediaPointe's new infringement theories based on Akamai's Mapper were produced early in discovery, long before MediaPointe's FICs. In fact, MediaPointe's expert does not cite any source code files for element 1[a] in his expert report, and all of the source code files that he cites in his report for claim elements 1[b] and 1[d] were produced in February 2023—four months before MediaPointe's FICs. *See* Coviello Declaration ¶ 6. Likewise, for claim elements 1[a], 1[b] and 1[d], as alleged support for each of MediaPointe's untimely new infringement theories, MediaPointe's expert cites technical documents that MediaPointe did not cite in its June 2023 FICs even though Akamai produced the documents ***months before MediaPointe's FICs***: [5]

| **Document Bates** | **When Produced?** | **Cited in June 2023 FICs?** | **Cited in MediaPointe's August 2023 Expert Report?** |
|---|---|---|---|
| AK-MP_00007572 | Feb. 2023 | No. | Yes at ¶ 168 (asserting that Akamai's Mapper |

[5] *See* Coviello Declaration ¶¶ 5-7.

| **Document Bates** | **When Produced?** | **Cited in June 2023 FICs?** | **Cited in MediaPointe's August 2023 Expert Report?** |
|---|---|---|---|
| | | | meets **claim 1[a]** and citing **DNS queries**) |
| AK-MP_00004446 | Feb. 2023 | No. | Yes at ¶ 178 (asserting that Akamai's Mapper meets **claim 1[b]** and alleging it maps trace routes to the client's **DNS resolver**) |
| AK-MP_00004408<br>AK-MP_00004416 | Feb. 2023 | No. | Yes at ¶ 179 (asserting that Akamai's Mapper meets **claim 1[b]** and alleging it maps trace routes using an **EDNS0-client-subnet**) |
| Source code files:<br>[redacted] | Feb. 2023 | No. | Yes at ¶¶ 193-201 (asserting that Akamai's Mapper meets **claim 1[b]** and listing all source code files cited for claim 1[b]) |
| AK-MP_00003881 | Jan. 2023 | No. | Yes at ¶ 327 (asserting that Akamai's Mapper |

| **Document Bates** | **When Produced?** | **Cited in June 2023 FICs?** | **Cited in MediaPointe's August 2023 Expert Report?** |
|---|---|---|---|
| Karger et al., *Consistent hashing and random trees: distributed caching protocols for relieving hot spots on the World Wide Web* (1997). | (Published 1997) | | meets **claim 1[d]** based on Akamai's "**consistent hashing**" technology)[6] |

## III. LEGAL STANDARDS

"The court may impose any just sanction for the failure to obey a scheduling order, including refusing to allow the disobedient party to support or oppose designated claims or defenses, or prohibiting that party from introducing designated matters in evidence." *O2 Micro*, 467 F.3d 1355 at 1363; *see also* Fed. R. Civ. P. 16(f); Fed. R. Civ. P. 37(b)(2)(A); Fed. R. Civ. P. 37(c)(1).

"Parties must demonstrate good cause to supplement their contentions." *Facet Techs.*, 2023 WL 5504954, at *2. "The Court may strike supplemental contentions containing amendments made without good cause." *Id.* "To show good

[6] Akamai also produced other documents regarding the newly accused "consistent hashing" technology early in discovery, including another public article describing Akamai's development and use of "consistent hashing" that was published in 1999. *See, e.g.*, Ex. 8 [The New Cool, 1999, AK-MP_00008114] (produced in February 2023) at AK-MP 00008120-8121; *see also, e.g.*, Ex. 9 [Akamai Network Overview, AK-MP_00007432] (produced in February 2023) at AK-MP 00007469-7470. *See* Coviello Declaration ¶¶ 7, 16-17.

cause, the party who has amended its contentions must show that it acted with diligence in promptly moving to amend when new evidence is revealed." *Id.* "The Court need not consider the prejudice question absent a showing of diligence, though the Court may exercise its discretion to do so." *Id.*

## IV. ARGUMENT

### A. MediaPointe's New Infringement Contentions Are Untimely

MediaPointe offered untimely new infringement contentions in its August 21, 2023 expert report, two months after the June 22, 2023 deadline for its FICs. Specifically, as discussed above in Section II.D, MediaPointe's expert offered multiple new infringement theories based on Akamai's Mapper for three key claim requirements. In its expert's report, MediaPointe thus both changed the accused products and asserted new theories for how multiple claim elements were purportedly met by newly accused functionalities:

***First***, for claim 1[a], MediaPointe asserted for the first time in its expert's report that:

- Akamai's Mapper allegedly is the claimed "management center" that allegedly receives a "request for media content" from the first client. Ex. 4 [Rubin Opening Report] ¶¶ 167-168; *see also* Ex. 5 [Rubin Dep.] 195:19-23.
- Akamai's Mapper's receipt of a "DNS query" is allegedly sufficient to meet the requirement that Mapper (the alleged management center) receives a "request for media content" from the first client. *See id.*

Although MediaPointe refers to GTM using a "mapping system" in its FICs for claim 1[a], MediaPointe never mentioned its new theory that Akamai's Mapper itself

is the "management center" or that Mapper allegedly receives a request for media content based on its receipt of a "DNS query." Ex. 2 ['195 FIC] at 2-6.[7]

***Second***, for claim 1[b], MediaPointe alleged for the first time in its expert's report that:

- Akamai's Mapper allegedly includes a mapping engine that satisfies the requirement to map trace routes to "the first client" by mapping trace routes to a DNS "resolver" that purportedly "approximates" the client's location. Ex. 4 [Rubin Opening Report] ¶ 178.
- Akamai's Mapper allegedly includes a mapping engine that satisfies the requirement to map trace routes to "the first client" by mapping trace routes using "EDNS0-client-subnet information." *Id.* at ¶ 179.

Although MediaPointe refers to GTM using a "mapper" in its FICs for claim 1[b], MediaPointe never mentioned its new theories for 1[b] that Akamai's Mapper itself is the "management center," that Mapper maps trace routes to DNS resolvers to "approximate[] the end user's location," or that Mapper uses "EDNS0-client-subnet information." Ex. 2 ['195 FIC] at 6-16.

***Third***, for claim 1[d], MediaPointe alleged for the first time in its expert's report that Akamai's Mapper will "identify and confirm if a node is already relaying the continuous stream of data" using Akamai's "consistent hashing" technology. Ex. 4 [Rubin Opening Report] ¶¶ 220, 223, 327. Although MediaPointe refers generally to GTM using mapping features in its FICs for claim 1[d], MediaPointe never mentioned its new theory that Mapper is itself the claimed "management center," or

---

[7] MediaPointe's infringement allegations that Akamai's Mapper is the claimed "management center" that allegedly receives a "request for media content" from "the first client" are addressed in Akamai's accompanying motion for summary judgment of non-infringement.

that Mapper uses Akamai's "consistent hashing" technology to allegedly meet claim 1[d]. *See* Ex. 2 ['195 FIC] at 22-29.

It is well established that a party's failure to include contentions in its FICs is grounds to strike new theories offered for the first time in an expert report or in an untimely amendment. *See, e.g.*, *Facet Techs.*, 2023 WL 5504954, at *3 (excluding supplemental invalidity contentions as untimely); *Polaris PowerLED Techs., LLC v. VIZIO, Inc.*, No. 18-CV-1571, 2020 WL 4258663, at *3-4 (C.D. Cal. May 14, 2020) (granting motion to strike certain opinions of infringement expert not disclosed in contentions); *Cal. Inst. of Tech. v. Hughes Commc'ns, Inc.*, No. 2:13-cv-07245, 2015 WL 11120845, at *1-2 (C.D. Cal. Apr. 13, 2015) (granting motion to strike portions of expert report discussing "instrumentalities not explicitly analyzed in Caltech's infringement contentions"); *B-K Lighting, Inc. v. Vision3 Lighting*, 930 F. Supp. 2d 1102, 1134-37 (C.D. Cal. 2013) (granting in part motion to strike expert report regarding infringement).

**B. There Is No Good Cause for MediaPointe's Untimely Contentions**

There is no good cause for MediaPointe's untimely new infringement allegations for multiple reasons.

***First***, as discussed above in Section II.E, for each of MediaPointe's new infringement theories, MediaPointe's expert relied on documents that Akamai produced early in fact discovery, months before MediaPointe's FICs. *See supra* Section II.E. MediaPointe had every opportunity to review and include these documents in its FICs, but failed to do so. It was only after MediaPointe realized that its FIC infringement theory based on Akamai's GTM had no basis that it shifted to a new—and equally baseless—infringement theory based on Akamai's Mapper, and then cited these Mapper documents for the first time in its expert's report. *See id.* MediaPointe plainly cannot show that it was diligent in supplementing its infringement contentions when documents it now seeks to rely on for its new

theories were produced early in discovery. *See Facet Techs.*, 2023 WL 5504954, at *3 (finding no good cause to amend contentions because the party offering untimely new contentions could have "searched for and identified the references included in both sets of supplemental contentions earlier").

Indeed, Akamai provided an interrogatory response on January 23, 2023—five months before MediaPointe's June 22, 2023 FICs—clearly explaining that Akamai's GTM does not perform any of the claimed "management center" functions and that "MediaPointe appears to have identified GTM [Global Traffic Management] as the alleged management center based solely on the fact that it includes the term 'management.'" Ex. 7 [Akamai 1/23/2023 Response to Rog 6] at 27, 33. But MediaPointe disregarded Akamai's interrogatory response and continued to insist that GTM was the alleged management center without any basis throughout discovery and in its FICs, only to abandon its GTM allegations after the FICs deadline and after the close of fact discovery. *Cf. Facet Techs.*, 2023 WL 5504954, at *3 (finding no good cause to amend contentions because the purported reason for the amendment (claim construction) was "foreseeable").

***Second***, MediaPointe's own expert admitted that he realized after approving MediaPointe's FICs that MediaPointe's infringement theory based on Akamai's GTM had no basis. Ex. 4 [Rubin Opening Report] ¶ 112 n.9; Ex. 5 [Rubin Dep.] 267:9-15. But the fact that MediaPointe was wrong about the infringement theory disclosed in its FICs is not good cause for MediaPointe to come up with new (and equally deficient) infringement contentions for the first time in its expert's report. If it were, that would entirely defeat the purpose of having final infringement contentions—to prevent a "shifting sands approach to litigation" and to allow each party the opportunity to defend against the other party's theories. *Polaris*, 2020 WL 4258663, at *2 (quoting *O2 Micro*, 467 F.3d 1355 at 1364); *see also California Inst. of Tech.*, 2015 WL 11120845, at *1 ("This Court requires infringement and

invalidity contentions so that the parties are aware of each other's theories early in the case. This requirement allows parties to adequately defend against these theories.").[8]

***Finally***, confirming that there is no good cause to add its new theories, MediaPointe never even sought leave to add its new infringement theories or to amend its FICs.

### C. Akamai Has Been Prejudiced by MediaPointe's Untimely Contentions

Akamai would be prejudiced if MediaPointe were allowed to propose new infringement theories for the first time in its expert report, two months after the deadline for its FICs and after the close of fact discovery. Akamai was forced to expend significant resources defending against MediaPointe's infringement allegations based on Akamai's GTM product ***for eight months***, only to have MediaPointe entirely shift its theories for multiple claim limitations only ***one month*** before Akamai's non-infringement expert report was due and after the close of fact discovery. As a result of MediaPointe's shifting sands approach to its contentions,

[8] During his deposition, MediaPointe's expert attempted to suggest that he merely used the wrong name for the accused functionalities—i.e., that when he referred to Akamai's GTM he was merely referring to Akamai's Mapper by the wrong name. Ex. 5 [Rubin Dep]. 269:2-19. Not so. As demonstrated above in Section II.D-E, MediaPointe's expert offered entirely new infringement theories based on alleged functionalities of Akamai's Mapper that were never disclosed (under any name) in MediaPointe's FICs. It is not merely that MediaPointe substituted the word "Mapper" for "GTM" in its expert's report; instead, MediaPointe's expert substituted different theories, different accused functionalities, and different documents and source code for multiple claim limitations. *See* Section II.D-E.

Akamai was given no opportunity to investigate and test MediaPointe's untimely theories during fact discovery. In similar circumstances, courts have recognized that such untimely disclosure of infringement contentions creates "***obvious prejudice***." *See Cal. Inst. of Tech.*, 2015 WL 11120845, at *2 (striking new infringement contentions disclosed for the first time in an expert report and explaining that "Caltech cannot overcome the obvious prejudice against Hughes that results from Caltech's failure to disclose [] all of its infringement theories"); *see also id.* ("Hughes would suffer prejudice if the Court allowed Caltech to introduce a previously undisclosed doctrine of equivalents theory at this stage of the litigation."); *Facet Techs.*, 2023 WL 5504954, at *3 (finding prejudice where the timing of the supplemental contentions left the opposing party with "a mere two to three months to undertake fact discovery" regarding the new contentions).

In any event, as this Court has explained, where (as here) there is no good cause for untimely amendments to contentions, the contentions should be excluded even without a showing of prejudice. *Facet Techs.*, 2023 WL 5504954, at *2 ("The Court may strike supplemental contentions containing amendments made without good cause" and "[t]he Court need not consider the prejudice question absent a showing of diligence, though the Court may exercise its discretion to do so.").

## V. CONCLUSION

MediaPointe's untimely infringement allegations are in direct violation of this Court's Scheduling Order setting June 22, 2023 as the deadline for final infringement contentions and a clear violation of its discovery obligations. Akamai respectfully requests that the Court grant this motion and strike MediaPointe's untimely new infringement theories.

DATED: October 16, 2023

Respectfully submitted,

**WILMER CUTLER PICKERING HALE AND DORR LLP**

By: /s/ *Michael J. Summersgill*

Michael J. Summersgill (*pro hac vice*)
michael.summersgill@wilmerhale.com
Jordan L. Hirsch (*pro hac vice*)
jordan.hirsch@wilmerhale.com
Asher S. McGuffin (*pro hac vice*)
asher.mcguffin@wilmerhale.com
WILMER CUTLER PICKERING HALE AND DORR LLP
60 State Street
Boston, Massachusetts 02109
Telephone: (617) 526-6000

Arthur W. Coviello (SBN 291226)
arthur.coviello@wilmerhale.com
WILMER CUTLER PICKERING HALE AND DORR LLP
2600 El Camino Real, Suite 400
Palo Alto, California 94306
Telephone: (650) 858-6069

Jason F. Choy (SBN 277583)
jason.choy@wilmerhale.com
WILMER CUTLER PICKERING HALE AND DORR LLP
350 South Grand Avenue, Suite 2400
Los Angeles, California 90071
Telephone: (213) 443-5300

*Attorneys for Plaintiff and Counterclaim-Defendant Akamai Technologies, Inc.*

**LOCAL RULE 11-6.2 CERTIFICATE OF COMPLIANCE**

The undersigned, counsel of record for Plaintiff and Counterclaim-Defendant Akamai Technologies, Inc., certifies that this brief contains 4,511 words, which complies with the word limit of L.R. 11-6.1.

DATED: October 16, 2023

By: /s/ *Michael J. Summersgill*

Michael J. Summersgill (*pro hac vice*)
michael.summersgill@wilmerhale.com
WILMER CUTLER PICKERING
HALE AND DORR LLP
60 State Street
Boston, Massachusetts 02109
Telephone: (617) 526-6000

*Attorney for Plaintiff and Counterclaim-Defendant Akamai Technologies, Inc.*