Kalpana Srinivasan (California 237460)
ksrinivasan@susmangodfrey.com
SUSMAN GODFREY L.L.P.
1900 Avenue of the Stars, Suite 1400
Los Angeles, California 90067-6029
Telephone: (310) 789-3100
Facsimile: (310) 789-3150

Meng Xi (California 280099)
mxi@susmangodfrey.com
Thomas V. DelRosario (California 236264)
tdelrosario@susmangodfrey.com
Larry Liu (*pro hac vice*)
lliu@susmangodfrey.com
SUSMAN GODFREY L.L.P.
1000 Louisiana, Suite 5100
Houston, Texas 77002-5096
Telephone: (713) 651-9366
Facsimile: (713) 654-6666

Attorneys for Defendants and
Counterclaimant MediaPointe, Inc.

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| AKAMAI TECHNOLOGIES, INC.,<br><br>Plaintiff,<br><br>v.<br><br>MEDIAPOINTE, INC. and AMHC, INC.,<br><br>Defendants. | Case No. 2:22-cv-06233-MCS-SHKx<br><br>**OPPOSITION TO AKAMAI'S MOTION TO STRIKE MEDIAPOINTE'S INFRINGEMENT CONTENTIONS FROM ITS EXPERT'S REPORT** |
| MEDIAPOINTE, INC.,<br><br>Counterclaimant,<br><br>v.<br><br>AKAMAI TECHNOLOGIES, INC.,<br><br>Counterclaim-Defendant. | Hearing Date: November 20, 2023<br>Time: 9:00 AM<br>Location: Courtroom 7C, 7th Floor<br>Judge: Mark C. Scarsi |

# Table of Contents


I. Introduction ........ 1

II. Statement of Facts ........ 1

- A. The '195 Patent ........ 1
- B. MediaPointe's Infringement Contentions ........ 3
- C. Infringement Theories in Dr. Rubin's Expert Report ........ 5

III. Legal Standard ........ 8

IV. Argument ........ 9

- A. MediaPointe Has Not Offered "New" Infringement Theories in Its Expert Report ........ 9
  - 1. Claim 1[a]: "Management Center" ........ 9
  - 2. Claim 1[a]: "Request for Content" ........ 11
  - 3. Claim 1[b]: DNS "resolver" and "EDNS0" ........ 13
  - 4. Claim 1[d]: Consistent Hashing ........ 14
- B. Akamai Has Not Demonstrated Any Prejudice ........ 16

V. Conclusion ........ 17

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Apple, Inc. v. Samsung Elecs. Co., Ltd.*,
2012 WL 5632618 (N.D. Cal. Nov. 15, 2012) ....16

*Brandywine Comm'cns Techs., LLC v. AT&T Corp.*,
2014 WL 1569544 (N.D. Cal. Apr. 18, 2014) ....16

*Comcast Cable Comms., LLC v. OpenTV, Inc.*,
2017 WL 2630088 (N.D. Cal. June 19, 2017) ....9

*Creagri, Inc. v. Pinnaclife Inc., LLC*,
2012 WL 5389775 (N.D. Cal. Nov. 2, 2012) ....8

*DCG Sys. v. Checkpoint Tech., LLC*,
2012 WL 1309161 (N.D. Cal. Apr. 16, 2012) ....8

*Digital Reg. of Texas, LLC v. Adobe Sys. Inc.*,
2014 WL 1653131 (N.D. Cal. Apr. 24, 2014) ....15

*Finjan, Inc. v. Blue Coat Sys., LLC*,
2017 U.S. Dist. LEXIS 220192 (N.D. Cal. July 28, 2017) ....9

*Tech. Licensing Corp. v. Grass Valley USA, Inc.*,
2014 WL 3752108 (N.D. Cal. July 30, 2014) ....8

*Wi-LAN v. LG Elecs., Inc.*,
2019 WL 5790999 (S.D. Cal. Sept. 18, 2019) ....9, 11, 15

# I. Introduction

MediaPointe's Final Infringement Contentions ("FICs") accused Akamai's "mapping system" of performing the functions of the claimed "management center." Akamai's motion concedes, multiple times, that MediaPointe identified a "mapping system" and that the Accused Products "us[e] a 'mapper' in its FICs." Akamai's Memorandum In Support of Motion to Strike ("Memo.") at 13–14. MediaPointe's FICs even cited [redacted] That mapping system, it turns out, Akamai has named "Mapper," not, as MediaPointe named it in its FICs, "Global Traffic Management." "Mapper" is a name internal to Akamai and not marketed in any of Akamai's public facing documents.

Akamai's motion to strike is based almost entirely on this semantic error. It is undisputed that the substance of that functionality was fully disclosed. The fact that MediaPointe identified it by a different name cannot possibly justify the drastic relief that Akamai seeks. The correction of the semantic error does not constitute a "new" infringement theory, and even if it did, Akamai has incurred no prejudice. Unsurprisingly, beyond boilerplate assertions of prejudice, Akamai has not identified any additional discovery it would have needed—in terms of documents, source code, or witnesses—in preparing its defenses.

Akamai's motion to strike should be denied.

# II. Statement of Facts

## A. The '195 Patent

The '195 patent describes a system and method for efficiently distributing streamed media content to widely and diversely located clients. As the patent explains, prior art transmission schemes faced two primary challenges: "bandwidth constraint and inefficient routing." '195 patent, 2:61–65; *id.* Fig. 1.




FIG. 1

To solve these problems, the '195 patent discloses "an intelligent distribution network (IDN) center" that "manages the delivery of the streamed media to a plurality of clients." *Id.*, Abstract. The management center, also referred to as the "IDN Center" in the specification, uses a mapping engine that determines paths for delivering content on the network. *See id.* at 3:37–41; 7:63–67. The nodes are points on the network that receive streams of data from a content provider and pass them along to end user clients. *See id.* at 3:29–40.

In the method of the '195 patent, in response to requests for content from clients, the management center directs the clients to specific nodes by using a mapping engine that maps trace routes between the management center, the client, and nodes. *See id.* at 17:40–51. Using the data from trace routes, the management center "direct[s] the first client to a node" that it selects "to relay a content stream." *Id.*

If another client requests the same content as the first client, the '195 patent instructs how to deliver that content without retrieving it again from the content provider. The management center directs a node that is "already relaying the content stream" to replicate it and transmit it to the subsequent client. *See id.* at 17:54–63.

Claim 1 states in full:

> **[pre]** A method comprising:
>
> **[a]** receiving an initial request for media content from a first client, the request being received by a management center;
>
> **[b]** directing the first client to a node that is selected to relay a content stream from a content provider to the first client by using a mapping engine that maps trace routes between the management center, the node, and the first client, the first client being directed to the node by the management center;
>
> **[c]** relaying the content stream from the content provider to the first client via the selected node;
>
> **[d]** replicating the content stream for other clients during the relaying of the content stream at the selected node, in response to subsequent requests for the media content from the other clients, the other clients connected to the selected node based on an identification that the selected node is already relaying the content stream from the content provider to the first client; and
>
> **[e]** transmitting the replicated content stream from the selected node to at least one other client in response to the subsequent requests for the media content.

**B. MediaPointe's Infringement Contentions**

MediaPointe's Final Infringement Contentions ("FICs") accused Akamai's "suite of Content Delivery Network (CDN) offerings" that "provide load balancing, routing, caching, and other services to customers" of infringing the '195 patent. Ex. 1, MediaPointe's FICs, Ex. A, at 1.

In describing Akamai's Content Delivery system, MediaPointe explained that Akamai relied on a "cloud computing platform that allows customers to host applications and utilize Akamai's servers to host data, run applications, and provide

security." That platform, MediaPointe alleged, was "controlled by a management center." *Id.*, Ex. A, at 2. To manage the "345,000 servers in more than 135 countries" around the world, MediaPointe contended, Akamai "employs a 'mapping system [that] collects information about the state of the Akamai network and locates the caching server that can serve the content.'" *Id.*, Ex. A, at 4, 7, 8 (citing https://people.cs.rutgers.edu/%7Epxk/417/notes/cdn.html).[1]

With respect to claim elements 1[a] and 1[b], MediaPointe's infringement contentions noted that upon receiving a user's request for content, Akamai's mapping system directs the user to a server closer to the user, as opposed to sending the user to the origin server or content provider itself. *Id.* at 6 ("When requested content is cached (pre-saved) by a CDN's servers, an end user's ISP or mobile provider gets that content by connecting to a server on the CDN's network, rather than waiting for their request to go directly to the origin."). The first step, MediaPointe's FICs note, is that a "client requests some content." *Id.* at 25. In turn, a "DNS server reroutes the client request to an edge server. Akamai determines the best edge server to deliver the content to the client." *Id.*

To determine "the best edge server," Akamai relies on "maps of network nodes" and "makes internal use of network mappings." *Id.* at 12–13. Based on these maps, Akamai selects the edge server to respond to the client's request. In turn, the edge server receives the specific computer message—an HTTP request—and delivers the particular content to the client. *Id.* at 10 ("An edge server that receives a stream request downloads the content from its optimal storage location and caches it locally while serving the request.").

MediaPointe's FICs also cited illustrative source code. In describing Akamai's mapping process, MediaPointe identified several files—including, for instance,

[1] As the cited document further explains, Akamai "use[s] the requestor's IP address to find the nearest edge server that is likely to hold the cached content for the requested site." https://people.cs.rutgers.edu/%7Epxk/417/notes/cdn.html.

[redacted]—that showed that Akamai's mapping system [redacted] *Id.* at 13. In describing [redacted], MediaPointe noted that [redacted] *Id.* That file, MediaPointe noted, allowed for the [redacted] *Id.* Similarly, in describing the code file [redacted], MediaPointe explained, "[redacted]" *Id.* at 14. MediaPointe denoted the "mapping system" that performed these functions "Global Traffic Management." *Id.* at 4, 14.[2]

With respect to claim element 1[d], MediaPointe cited Akamai's public documentation concerning its CDN components, which explained that Akamai's edge servers "engaged in partial object caching"—*i.e.*, the caching of large files "in chunks" that can be delivered to subsequent clients "while the initial requester is still receiving the remaining chunks of their file from the same node." Additionally, [redacted]" *Id.* at 28. The "[redacted]" after an edge server serves the requested content to the client. *Id.* at 21. Based on the capability of Akamai's servers to perform partial object caching and to determine content's popularity, MediaPointe alleged that Akamai's system was "configured to deliver those cached chunks to users that subsequently request the same large files while the initial requester is still receiving the remaining chunks of their file from the same node." *Id.* at 25.

### C. Infringement Theories in Dr. Rubin's Expert Report

[2] MediaPointe also identified Global Traffic Management as one of Akamai's Content Delivery Network products. *Id.* at 1.

In detailing Akamai's infringement of the '195 patent in his expert report, Dr. Rubin began, as MediaPointe's infringement contentions did, by explaining the mechanics of Akamai's CDN. Akamai's CDN relies on a "Mapping System," known as "Mapper." Ex. 4, Rubin Report, ¶¶ 128–29, 133–42. That system's "main responsibility is to create and maintain maps of the Internet in order to select edge servers when content is requested." *Id.* ¶ 134.

More specifically with respect to claim elements 1[a] and 1[b], Dr. Rubin explained that Akamai's Mapper (the "management center") first receives a request for content. *Id.* ¶¶ 116 ("First, '[t]he client requests some content.' (citing AK-MP_00013760)), ¶ 134, ¶¶ 167–68 (explaining that "Akamai's mapping system, known as 'Mapper,' receives the request for content" and that the "request for content is initiated by a DNS query"). That request for content is initiated by a computer message known as a DNS request or DNS query. *Id.* ¶ 168. Once Mapper has received the request for content, it initiates a series of steps to direct the end user to a specific edge server. [redacted] To do so, the Mapper must know [redacted] *Id.* ¶ 135 (citing AK-MP_00007688). Akamai's document bates-stamped AK-MP_00007688, with highlighting added, explains as follows:

[redacted]

Once a region is selected, "Mapper then determines which edge server in that region should be selected to fulfill the content request." Ex. 4, Rubin Report, ¶ 139. [redacted] which "allows Mapper to

determine how much demand there is for the requested content." *Id.*; *compare* MediaPointe's Infringement Contentions, Ex. A, at 13 (describing [redacted], [redacted]).

Dr. Rubin's report explains that Mapper relies on "a map of the network that contains information on various network entities" to decide which edge server to assign. Ex. 4, Rubin Report, ¶ 177; *compare* Ex. 1, MediaPointe's Infringement Contentions, Ex. A, at 14 (discussing use of "a map of network entities, where a ping value is assigned to a node."). This group of network entities includes the client. Akamai creates [redacted] Ex. 4, Rubin Report, ¶¶ 177–79.

With respect to claim element 1[d], Dr. Rubin's expert report—like MediaPointe's infringement contentions—pointed to the capability of Akamai's servers to perform partial object caching and to assign popularity scores to content to identify whether the selected node "is already relaying the content stream from the content provider to the first client." *Id.* at ¶ 221 ("As shown above in 'Content Characteristics & AMD [Adaptive Media Delivery]', content streamed by edge servers is assigned a popularity score based on how often it is accessed by clients."); *id.* ¶ 222 ("Additional evidence that the Mapper will direct a subsequent client to a node based on an identification that it is already relaying the content to another client is provided by use of the 'partial object caching' technique."). Dr. Rubin also noted that Akamai used a "load balancing algorithm combined with its consistent hashing" to identify whether media content is already being relayed. *Id.* ¶ 223. Consistent hashing is an Akamai algorithm that utilizes certain content's popularity in determining which edge server should serve that content. *See* Ex. 2, AK-MP_00007577 ("Depending on the

popularity of the content being served under serial number 212, the authoritative name server for the CDN returns the first *k* addresses on this list, skipping any servers that are not operational."); Ex. 3, Nygren Depo., at 132:1–15 (explaining that the preceding statement is "a description of the general consistent hashing algorithm").

The Accused Akamai Products use this underlying technology to deliver specific kinds of content to end users. As Dr. Rubin explains, the "Accused Akamai Products relate to the delivery of specific types of content that run on Akamai's networks." Ex. 4, Rubin Report, ¶ 113. "Media Delivery, for instance, refers to a category of products that Akamai offers its customers for the delivery of video and audio content on its networks." *Id.* ¶ 114.

## III. Legal Standard

The parties agreed to exchange infringement and invalidity contentions consistent with the Northern District of California's Patent Local Rules. Those rules "provide for a 'streamlined mechanism to replace the series of interrogatories that accused infringers would likely have propounded in its absence.' " *Creagri, Inc. v. Pinnaclife Inc., LLC*, 2012 WL 5389775, at *2 (N.D. Cal. Nov. 2, 2012) (quoting *FusionArc*, 2007 WL 1052900, at *2).

The touchstone of Local Rule 3-1 is notice. The plaintiff must give sufficient specificity so as "to provide reasonable notice to the defendant why the plaintiff believes it has a reasonable chance of proving infringement." *Tech. Licensing Corp. v. Grass Valley USA, Inc.*, 2014 WL 3752108, at *3 n.22 (N.D. Cal. July 30, 2014) (quotation marks omitted). The "rules do not, as is sometimes misunderstood, 'require the disclosure of specific evidence [or] require a plaintiff to prove its infringement case.' " *Creagri,* 2012 WL 5389775, at *2 (quoting *DCG Sys. v. Checkpoint Tech., LLC*, 2012 WL 1309161, at *2 (N.D. Cal. Apr. 16, 2012)). Because the "purpose of the rule is 'to further the goal of full, timely discovery and provide all parties with adequate notice of and information with which to litigate their cases,'" the rule "distinguishes 'between the required identification of the precise element of any

accused product alleged to practice a particular claim limitation, and every evidentiary *item of proof* showing that the accused element did in fact practice the limitation.'" *Comcast Cable Comms., LLC v. OpenTV, Inc.*, 2017 WL 2630088, at *3 (N.D. Cal. June 19, 2017) (quotation marks omitted).

Thus, "[t]he scope of contentions and expert reports are not . . . coextensive." *Wi-LAN v. LG Elecs., Inc.*, 2019 WL 5790999, at *3 (S.D. Cal. Sept. 18, 2019). "Contentions need not disclose specific evidence, whereas expert reports must include a complete statement of the expert's opinions, the basis and reasons for them, and any data or other information considered when forming them." *Id.* "The dispositive inquiry in a motion to strike is . . . whether the allegedly undisclosed 'theory' is in fact a new theory or new element of the accused product alleged to practice a particular claim that was not previously identified in the plaintiff's contentions, or whether the 'theory' is instead the identification of additional evidentiary proof showing that the accused element did in fact practice the limitation." *Finjan, Inc. v. Blue Coat Sys., LLC*, 2017 U.S. Dist. LEXIS 220192, at *14 (N.D. Cal. July 28, 2017).

## IV. Argument

### A. MediaPointe Has Not Offered "New" Infringement Theories in Its Expert Report.

#### *1. Claim 1[a]: "Management Center"*

Regarding claim element 1[a], Akamai argues that Dr. Rubin offers two new opinions in his report. First, Akamai says, Dr. Rubin alleges that Mapper is the claimed "management center," not Global Traffic Management. Memo. at 13. Second, Akamai contends that Dr. Rubin offers a new opinion that receiving a "DNS query" constitutes receiving a "request for media content." *Id.* Neither is correct.

As to the "management center," MediaPointe's infringement contentions repeatedly identified Akamai's use of a "mapping system" that performed the method of the '195 patent. That mapping system "collects information about the state of the Akamai network and locates the caching server that can serve the content.'" *Id.* at 4, 7,

8 (citing https://people.cs.rutgers.edu/%7Epxk/417/notes/cdn.html). Indeed, Akamai concedes that "MediaPointe refers to GTM using a 'mapping system' in its FICs for claim 1[a]," yet nonetheless contends that MediaPointe "never mentioned its new theory that Akamai's Mapper itself is the 'management center.'" Memo. at 13–14.

MediaPointe's identified the "mapping system" as "Akamai's Global Traffic Management." *Id.* at 4, 8. But the claimed infringing function remained the same from MediaPointe's infringement contentions to its expert report. As Dr. Rubin explained in his deposition:

> [redacted]

Ex. 5, Rubin Depo. at 268:19–269:1; *id.* at 269:17–19 ("[N]othing in my analysis changes except the fact that the thing that we were looking at isn't what Akamai calls its GTM."); Ex. 6, Rubin Decl. ¶ 7 [redacted]).

In fact, much of the code cited in MediaPointe's final infringement contentions—though incidentally described as relating to GTM—in fact was *Mapper* code. Ex. 6, Rubin Decl. ¶¶ 7–23. For instance, MediaPointe's final infringement contentions identified [redacted] as supporting Akamai's "mapping of trace routes." Based on comments in the code, Dr. Kanitkar tentatively noted that the file appeared to be "part of the regular mapping system." Ex. 7, Kanitkar Depo. at 243:3–14. And as Dr. Rubin confirms in his declaration in support of this Opposition, [redacted] In fact, the vast majority of the code files

that MediaPointe cited in its final infringement contentions relate to Mapper, not GTM, including [redacted]. Ex. 6, Rubin Decl., ¶¶ 7–22.

Finally, Akamai emphasizes that the documents and source code that Dr. Rubin relied on in his expert report were produced in February, months before MediaPointe's FICs. Memo. at 10–11 ("MediaPointe's expert cites technical documents that MediaPointe did not cite in its June 2023 FICs even though Akamai produced the documents ***months before MediaPointe's FICs***."). But Akamai conflates the *notice* function of infringement contentions with an *evidentiary* one. Unlike expert reports, infringement contentions "need not disclose specific evidence." *Wi-LAN, Inc.*, 2019 WL 5790999, at *3. That Akamai produced documents and code relating to Mapper early in fact discovery merely confirms that Akamai has long been on notice that MediaPointe was alleging that its *mapping system* performed the functions of the claimed "management center."

*2. Claim 1[a]: "Request for Content"*

Akamai next says that Dr. Rubin offers a new theory that the management center "receives a request for media content based on its receipt of a 'DNS query.'" Memo. at 13-14.

As an initial matter, Akamai misapprehends MediaPointe's infringement theory.[3] As Dr. Rubin explains, Akamai's Mapper receives the end user's request for content and in response, initiates a series of steps that ultimately results in the user's receipt of that content. The first step is a DNS query. *See* Ex. 4, Rubin Report, ¶ 168 ("The request for content is initiated by a DNS query." (citing AK-MP_00007572, at -7572 ("A typical request for content begins with a DNS query issued by a client to its

[3] As explained in more detail in MediaPointe's Opposition to Akamai's Motion for Summary Judgment, Akamai commits this same error in seeking summary judgment on non-infringement.

resolving name server.”))). In other words, to begin the process of directing a client to an edge server, Mapper must receive a client’s request for content. Rubin Depo. 194:24–195:7 [redacted]

That is the same theory proffered in MediaPointe’s FICs: On receiving a user’s request for content, Akamai’s mapping system directs the user to a server closer to the user, as opposed to sending the user to the origin server or content provider itself. Ex. A, at 6 (“When requested content is cached (pre-saved) by a CDN’s servers, an end user’s ISP or mobile provider gets that content by connecting to a server on the CDN’s network, rather than waiting for their request to go directly to the origin.”); *id.* at 25 (explaining that the first step in the flow of Akamai’s CDN is that the “client ***requests some content***,” and in turn, the “DNS server ***reroutes the client request*** to an edge server”).

Indeed, MediaPointe’s FICs cited the ***same document*** that Dr. Rubin relied on in his expert report. The expert report cites a document titled, “Flow of the Akamai CDN.” Ex. 4, Rubin Report, ¶ 169 (citing AK-MP_00013760). MediaPointe’s FICs contain precisely the same text. Ex. A, at 25 (citing now-dead URL https://techdocs.akamai.com/platform-basics/docs/cdn-flow):

1. The client requests some content. As far as your customer knows, their browser or app goes to the URL of your website—for example, https://www.example.com.
2. Since you’ve added a record to your DNS, the DNS server reroutes the client request to an edge server. Akamai determines the best edge server to deliver the content to the client.
3. The edge server determines if the content is up to date by examining the time to live (TTL) you’ve set for cached content.
    a. If the content is up to date, the edge server sends the cached version of the requested content to the client.
    b. If the content has expired, the edge server requests updated content. The updated content is held in the edge server cache for your TTL.

As Akamai's expert, Dr. Kurose, explained in his report, Akamai in fact updated their own webpage to revise the figure on its website "after reviewing MediaPointe's Final Infringement Contentions": "I discussed the figure [in this document] with Christopher 'Kit' Knox, the Vice President of Intelligent Edge Engineering at Akamai. He mentioned that ***after reviewing MediaPointe's Final Contentions citing the figure***, he realized how MediaPointe misunderstood the figure and how other people visiting Akamai's website also may be misunderstanding the figure. *See* MediaPointe's Final Infringement Contentions dated June 22, 2023, Ex. A at 24 (citing figure above). In light of this misunderstanding, ***Mr. Knox had the figure on the website changed to more accurately depict the details of the actual operation of Akamai's System*** . . . ." Ex. 8, Kurose Report, ¶ 128.

MediaPointe's FICs thus presented not only the same theory, but even highlighted the *same evidence* in support of that theory. Akamai is simply incorrect that MediaPointe's theory that Mapper receives a "request for content" was not disclosed.

*3. Claim 1[b]: DNS "resolver" and "EDNS0"*

Regarding claim element 1[b], Akamai claims that MediaPointe offers new theories that a mapping engine maps trace routes to "the first client" by mapping trace routes to a DNS "resolver" and using "EDNS0-client-subnet information. Memo. at 14. But these are not new *theories*; they are evidence in support of MediaPointe's infringement theories.

MediaPointe's FICs explained that Akamai employs a "mapping system [that] collects information about the state of the Akamai network and locates the caching server that can serve the content." Ex. 1, MediaPointe's Infringement Contentions, Ex. A, at 8. In turn, "[a]mong the information collected by the mapping engine are trace routes between the management center, the node, and the clients." *Id.* The FICs continue, "Akamai manages an overlay network: the collection of its thousands of servers and statistics about their availability and connectivity. Akamai generates ***its***

***own map of overall IP network topology*** based on BGP (Border Gateway Protocol) and ***traceroute data*** from ***various points on the network*** as well as probe messages between various content servers and between various Akamai content servers and origins."

[redacted]

*4. Claim 1[d]: Consistent Hashing*

The last opinion that Akamai claims was undisclosed is that "Akamai's Mapper will 'identify and confirm if a node is already relaying the continuous stream of data' using Akamai's 'consistent hashing' technology." Memo. at 14. Again, Akamai is incorrect.

In MediaPointe's FICs, MediaPointe expressly noted that Akamai associates a popularity score with cached content. MediaPointe's FICs, Ex. A, at 28 [redacted]. Dr. Rubin's report also relies on the content's popularity score to show that Akamai infringes this claim element. Ex. 4, Rubin Report, ¶ 221 [redacted]. Akamai does not contest that MediaPointe disclosed in its FICs its theory that Akamai uses a popularity score.

Put simply, consistent hashing is Akamai's algorithm that utilizes content's popularity in determining which edge server should serve that content. *See* Ex. 2, AK-MP_00007577 ("Depending on the popularity of the content being served under serial number 212, the authoritative name server for the CDN returns the first *k* addresses on this list, skipping any servers that are not operational."); Ex. 3, Nygren Depo., 132:1–15 (explaining that the preceding statement is "a description of the general consistent hashing algorithm").

In referencing consistent hashing, Dr. Rubin's report merely identifies additional supporting evidence consistent with MediaPointe's FICs—*i.e.*, the algorithm used to account for content's popularity in identifying a node is already relaying content to a first client. *See Digital Reg. of Texas, LLC v. Adobe Sys. Inc.*, 2014 WL 1653131, at *5 (N.D. Cal. Apr. 24, 2014) ("In patent litigation, expert reports are expected to provide more information than is contained in infringement contentions."). As the table below shows, Dr. Rubin's opinions concerning consistent hashing are entirely "consistent with the theories of infringement" in MediaPointe's FICs. *See Wi-LAN Inc.*, 2019 WL 5790999, at *4 (declining to strike Wi-LAN's expert's opinions relating to hardware evidence that was not disclosed in infringement contentions because that evidence was "consistent with the theories of infringement" in Wi-LAN's infringement contentions).

| **FICs, Ex. A** | **Rubin Report** |
|---|---|
| **Page 28**: "Cache entries can also be associated with a popularity score." **Page 29**: Explaining that element 1[d] is met because Akamai "directs its Ghost edge servers (*i.e.*, 'the selected node[s]') ***to check their caches*** (*i.e.*, 'an identification that the selected node is already relaying the content stream from the content provider') to see if | ¶ 223: "Akamai describes the process by which its FreeFlow implementation uses a load balancing algorithm combined with its consistent hashing to ensure that requests for media content are served by the optimal edge server in a particular region. *See* AK-MP_00017768; AK-MP_00017777. Part of this process for selecting the optimal edge |

| | |
|---|---|
| that particular content stream has already been requested by a previous client" | server includes quickly determining ***whether a requested object (a particular stream of media content) already resides on that edge server***. . . . In the case of these edge servers delivering streaming media, a determination that a particular edge server has that requested content in its cache implies that that edge server is currently relaying that content stream to another client." |

### B. Akamai Has Not Demonstrated Any Prejudice.

Separately, the Court should decline to strike Dr. Rubin's opinions relating to Mapper because the disclosure is substantially justified and harmless. Akamai has not incurred any prejudice here.

For starters, MediaPointe did not assert new claims or identify new products. *See Brandywine Comm'cns Techs., LLC v. AT&T Corp.*, 2014 WL 1569544, at *16 (N.D. Cal. Apr. 18, 2014) (granting leave to amend where "Brandywine's supplemental contentions essentially expand on its previous infringement contentions and do not add any patent claims or products"). Moreover, because MediaPointe repeatedly identified Akamai's mapping system in its FICs—even if not properly named as Mapper—the correction of the semantic error did not change Akamai's defenses. *Apple, Inc. v. Samsung Elecs. Co., Ltd.*, 2012 WL 5632618, at *3 (N.D. Cal. Nov. 15, 2012) (finding no prejudice where the amendment "merely add[ed] another device that has the same accused functionality as the previous versions," and thus, "Apple's analysis in defending against Samsung's contentions [would] remain largely the same").

For its part, Akamai offers only the boilerplate assertion that MediaPointe's misnaming of the management center caused it "obvious prejudice" because it "was given no opportunity to investigate and test" this theory during fact discovery. Memo.

at 17–18. But Akamai has not identified any witnesses, documents, or additional discovery that it believes it would have sought under MediaPointe's allegedly "new" infringement theories. And Akamai's claimed prejudice is belied by its own repeated insistence that it in fact produced the code and documents that Dr. Rubin relies on "long before MediaPointe's FICs." Memo. at 10–12. As Akamai knows, each of its witnesses—Vinay Kanitkar, Alex Caro, Kit Knox, and Erik Nygren—was fully deposed about Mapper without any suggestion that the topic was not a proper subject of discovery relevant to the Accused Akamai Products.

Akamai claims that it "devoted significant resources responding to MediaPointe's allegations that Akamai's GTM was the claimed management center." But the fact that MediaPointe *dismissed* an Accused Product and acknowledged that "GTM is not a content delivery product" is not prejudice to Akamai; it has only narrowed the scope of the case. Memo. at 5–6; Ex. 4, Rubin Report ¶ 112 n.9.

In sum, MediaPointe's expert report did not offer any "new" infringement theories that were not previously disclosed in MediaPointe's FICs. And the only amendment—correcting the name of the claimed management center—has not prejudiced Akamai.

## V. Conclusion

For these reasons, the Court should deny Akamai's Motion to Strike.

Dated: October 30, 2023

*/s/ Kalpana Srinivasan*
Kalpana Srinivasan (SBN 237460)
SUSMAN GODFREY LLP
1900 Avenue of the Stars, Suite 1400
Los Angeles, California 90067
Tel: (310) 789-3100
Fax: (310) 789-3150
ksrinivasan@susmangodfrey.com

Meng Xi (SBN 280099)
Thomas V. DelRosario (SBN 236264)
Larry Liu (*pro hac vice*)
SUSMAN GODFREY LLP

1000 Louisiana Street, Suite 5100
Houston, Texas 77002
Tel: (713) 651-9366
Fax: (713)654-6666
mxi@susmangodfrey.com
tdelrosario@susmangodfrey.com
lliu@susmangodfrey.com

*Counsel for Defendants MediaPointe*

**Local Rule 11-6.2 Certificate of Compliance**

The undersigned, counsel of record for Defendants and Counterclaimant MediaPointe, Inc., certifies that this brief contains 4,965 words, which complies with the word limit of L.R. 11-6.1.

*/s/ Kalpana Srinivasan*
Kalpana Srinivasan