Arthur W. Coviello (SBN 291226)
arthur.coviello@wilmerhale.com
WILMER CUTLER PICKERING
HALE AND DORR LLP
2600 El Camino Real, Suite 400
Palo Alto, California 94306
Telephone: (650) 858-6069

Michael J. Summersgill (*pro hac vice*)
michael.summersgill@wilmerhale.com
WILMER CUTLER PICKERING
HALE AND DORR LLP
60 State Street
Boston, Massachusetts 02109
Telephone: (617) 526-6000

[Additional Counsel Listed in Signature Block]

*Attorneys for Plaintiff and Counterclaim-Defendant Akamai Technologies, Inc.*

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| AKAMAI TECHNOLOGIES, INC.,<br><br>Plaintiff and Counterclaim-Defendant,<br><br>v.<br><br>MEDIAPOINTE, INC. and AMHC, INC.,<br><br>Defendants and Counterclaimant. | Case No. 2:22-cv-06233-MCS-SHKx<br><br>**PLAINTIFF AKAMAI TECHNOLOGIES, INC.'S REPLY IN SUPPORT OF MOTION TO STRIKE MEDIAPOINTE'S UNTIMELY INFRINGEMENT CONTENTIONS FROM ITS EXPERT'S REPORT**<br><br>**REDACTED**<br><br>Hearing Date: November 20, 2023<br>Time: 9:00 AM PT<br>Location: Courtroom 7C, 7th Floor |

# TABLE OF CONTENTS


I. INTRODUCTION .......... 1

II. ARGUMENT .......... 2

**A.** MediaPointe's Untimely Infringement Contentions Assert Entirely New Theories of Infringement .......... 2

**1.** Claim 1[a] – "Management Center" (GTM vs. Mapper) .......... 3

**2.** Claim 1[b] – "DNS resolver" and "EDNS0-client-subnet information" .......... 5

**3.** Claim 1[d] – "Consistent Hashing" .......... 7

**B.** MediaPointe's Belated Disclosure of These Untimely Infringement Theories Is Improper and Prejudicial to Akamai .......... 10

III. CONCLUSION .......... 11

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Facet Techs., LLC v. LifesSan, Inc.*,
2023 WL 5504954 (C.D. Cal. June 7, 2023) .......... 10

*Finjan, Inc. v. Blue Coat Systems, Inc.*,
2015 WL 3640694 (N.D. Cal. June 11, 2015) .......... 10

*Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*,
2013 WL 6185357 (N.D. Cal. Nov. 26, 2013) .......... 11

# I. INTRODUCTION

MediaPointe attempts to obscure the fundamental shifts in its infringement allegations from its "Final" Infringement Contentions ("FICs") to its expert's infringement report by mischaracterizing Akamai's products and glossing over the specific element-by-element changes that Akamai identified in its Motion to Strike ("Mot.") (Dkt. 135-1). MediaPointe's arguments should be rejected.

MediaPointe does not dispute in its opposition ("Opp.") (Dkt. 149) that (1) the ***only*** Akamai product it accused of meeting the "management center" claim limitation in its Preliminary Infringement Contentions ("PICs") and FICs was Akamai's Global Traffic Management ("GTM") product, (2) the parties engaged in discovery relating to GTM for ***eight months*** (from MediaPointe's December 2022 PICs to its expert's August 2023 report) based on those allegations, and (3) it has now abandoned those allegations: MediaPointe no longer alleges that Akamai's GTM functions as the "management center" at all, and instead, claims that a ***different Akamai technology***—the Akamai CDN's "Mapper" system—functions as the claimed management center.

MediaPointe tries to paper over this fundamental change of course by claiming it is due to an inconsequential "semantic error" regarding the name for Akamai's Mapper. Opp. at 1, 9-11, 16. That is simply not true. Akamai's Mapper system is part of Akamai's content delivery network ("CDN") technology, which uses Akamai edge servers to deliver content to individual users. By contrast, GTM is a fundamentally different product that assists corporate customers in managing their datacenters without the use of Akamai edge servers. Moreover, the way in which MediaPointe alleged infringement based on Akamai's GTM is fundamentally different from how it is now alleging infringement based on Akamai's CDN's Mapper. Indeed, comparing what MediaPointe alleged in its FICs compared to what it alleged in its expert report, the differences are unmistakable, including switches to

entirely different source code and different functionality. MediaPointe's untimely infringement theory based on Akamai's Mapper should be stricken.

# II. ARGUMENT

## A. MediaPointe's Untimely Infringement Contentions Assert Entirely New Theories of Infringement

The asserted claims of the '195 patent require a specific series of steps and components for delivering media content requested by end user clients in a so-called "intelligent distribution network." The claims require, among other things:

- a ***management center*** that receives a client's initial request for media content;
- using a ***mapping engine*** to select a node to relay that content to the client;
- the management center directing the client to that node;
- relaying the content to the client via that node;
- replicating the content while relaying it;
- connecting ***other clients***, which are requesting the content, to that same node based on an identification that the selected node is already relaying the content stream from the content provider to the first client; and
- transmitting the content from that node to at least one of the other clients.

Dkt. 136-3 ['195 patent] at 17:41-63.

In short, the claims require a specific set of components that operate in a specific manner. It matters ***which*** specific components of a network are alleged to infringe and ***how*** those components are alleged to infringe. MediaPointe's brief glosses over the relevant details of the asserted claims and accused technologies,

hoping the Court will not look too closely and recognize the significant changes MediaPointe made in its infringement theories.

### 1. Claim 1[a] – "Management Center" (GTM vs. Mapper)

A key element in the asserted claims is a "management center" that receives a "request for media content" from a first client so that the management center can then direct the first client to a node (*e.g.*, server) to address the request: "receiving an initial request for media content from a first client, the request being received by a management center" (herein "claim 1[a]"). Dkt. 136-3 ['195 patent] at 17:41-45. There is no dispute that the ***only*** Akamai product MediaPointe accused of meeting the "management center" claim limitation in its FICs was GTM. Dkt. 135-3 [FICs] at 4 ("Akamai's Global Traffic Management ('GTM') functions as the management center."). And there is no dispute that MediaPointe has abandoned its GTM theory and now asserts that a ***different Akamai component for a different Akamai product***—Akamai's CDN's Mapper system—functions as the claimed management center instead of Akamai's GTM. Dkt. 135-4 [Rubin Opening Report] ¶ 112 n.9 ("[M]y report does not identify GTM as an infringing product."); *id.* ¶ 167 ("Mapper serves as the 'management center' in Akamai's platform.").

MediaPointe tries to argue that this is all a semantic misunderstanding and that when it previously accused "GTM" it really meant the "Mapper" of Akamai's CDN system. Opp. at 1, 9-11, 16. But these are fundamentally different products. Unlike Akamai's CDN system, which delivers content to clients using a vast network of Akamai edge servers, GTM is not a content delivery product at all. As MediaPointe's expert admitted in his expert report: "GTM is not a content delivery product.… Accordingly, my report does not identify GTM as an infringing product …." Dkt. 135-4 [Rubin Opening Report] ¶ 112 n.9. Instead, GTM is a separate product that allows Akamai's customers—who are ***not*** relying on Akamai's edge servers to deliver content—to "load balance" between their datacenters storing the

customers' data. Reply Ex. 10 [Kanitkar Dep. Tr.] 30:8-17 (testifying that GTM "is used by our customers so that end users can select between their origin servers"). The difference between GTM and Mapper is thus not a mere "semantic" issue. Rather, these are two products that perform different functions in different ways.

MediaPointe asks the Court to overlook its about-face in infringement theories because—according to MediaPointe—it purportedly accuses the same allegedly infringing "functionality" (*i.e.*, use of a "mapping system") in its FICs (GTM mapping system) and its expert report (Akamai's CDN mapping system). Opp. at 9-11. This mischaracterizes the facts. To be sure, both GTM and Akamai's CDN system use mapping systems that use DNS servers. But they are ***different mapping systems*** with ***different features and functionalities***. GTM's mapping system helps Akamai's customers "load balance" among their datacenters within their systems. Akamai's Mapper, in contrast, is responsible for selecting edge servers within Akamai's entire CDN that can then receive and respond to client requests. As evidenced by the changes in MediaPointe's infringement allegations, these two systems use different technologies to perform these very different functions. For example, when MediaPointe switched from its GTM to its Mapper theory, it pointed to entirely different source code than it had cited in its FICs for element 1[b] (*see infra* Section II.A.2) and Akamai's "consistent hashing" technology—a technology MediaPointe never mentioned a single time in its FICs—for element 1[d] (*see infra* Section II.A.3).

Moreover, there is nothing to MediaPointe's suggestion that it was only through innocent and inconsequential error that it accused GTM (and not Mapper) of meeting the "management center" limitation throughout the entire course of fact discovery. For example, Akamai explained in its January 2023 interrogatory responses—five months before MediaPointe's FICs—that GTM is irrelevant to this case. *See* Dkt. 136-9 [Akamai 1/23/2023 Response to Rog 6] at 27, 33 (explaining

MediaPointe's "incorrect assertions that Akamai's 'Global Traffic Management' (GTM) product constitutes the claimed management center," that "the documents MediaPointe cites do not support MediaPointe's assertion that GTM performs any of the claimed management center functions," and that "MediaPointe appears to have identified GTM as the alleged management center based solely on the fact that it includes the term 'management.'"). In fact, MediaPointe's expert noted in his October 30, 2023 Declaration (Dkt. 148-6) that Akamai's source code, which was produced by February 2023, includes [redacted]—thereby recognizing that GTM and Mapper are separate products. Dkt. 148-6 [Rubin Decl.] at ¶¶ 4-5 ("[redacted].").

MediaPointe had more than sufficient notice that GTM and Mapper were distinct and that GTM could not plausibly meet the "management center" element of claim 1[a]. MediaPointe's attempt to change course now by accusing a different mapping technology in a different product—and then to claim the dispute is merely about a "semantic error"—should be rejected.

**2. Claim 1[b] – "DNS resolver" and "EDNS0-client-subnet information"**

MediaPointe's fundamental shift in its infringement allegations is also demonstrated by its allegations for claim element 1[b]. This element requires, among other things, using a mapping engine to map trace routes between the management center, nodes, and the first client. MediaPointe's switch from GTM to Mapper as the alleged management center resulted in MediaPointe relying on entirely different, and previously undisclosed theories and evidence for claim 1[b].

MediaPointe's expert's infringement report now asserts that Mapper meets claim 1[b] by mapping trace routes (1) to a "DNS resolver," and/or (2) using

"EDNS0-client-subnet information." Dkt. 135-4 [Rubin Opening Report] ¶¶ 178-79. Nowhere in its FICs did MediaPointe mention mapping trace routes to a "DNS resolver" or to "EDNS0-client-subnet information" or suggest that mapping trace routes to the "DNS resolver" or the "EDNS0-client-subnet information" is somehow representative of mapping trace routes to a first client. *See* Dkt. 135-3 [FICs] at 6-16 (addressing claim 1[b]). These are entirely new infringement theories.

MediaPointe's response is to argue that "these are not new *theories*; they are evidence in support of MediaPointe's infringement theories." Opp. at 13. That is simply not true. This can be seen clearly by comparing the source code that MediaPointe cited for claim element [1b] in its FICs with the source code it cited for that element in its expert report. As shown below, there is ***zero*** overlap in the cited source code—confirming that MediaPointe is not merely providing additional evidence in support of the same theory, but rather is pointing to entirely new and different functionality to allege infringement:

| **Source Code Files Cited for Claim Element 1[b]** | |
|---|---|
| **Final Infringement Contentions**[1] | **Expert Report**[2] |
| [redacted] | [redacted] |

[1] Dkt. 135-3 [FICs] at 11-15.

[2] Dkt. 135-4 [Rubin Opening Report] ¶¶ 193-201.

| | |
|---|---|
| [redacted] | |

### 3. Claim 1[d] – "Consistent Hashing"

Element 1[d] requires, among other things, identifying that the selected node is already relaying the requested content from the content provider to the first client. Dkt. 136-3 ['195 patent] at 17:57-60 ("the other clients connected to the selected node based on an identification that the selected node is already relaying the content stream from the content provider to the first client"). As demonstrated in Akamai's opening brief, MediaPointe now alleges in its expert's report that Akamai meets this element based in part on its use of "consistent hashing" technology. Dkt. 135-4 [Rubin Opening Report] ¶¶ 223, 327. In fact, MediaPointe's expert asserts that, based on Akamai's use of its "consistent hashing" functionality, "at least 50 percent of the usage of Akamai's CDN would infringe on the '195 Patent." *Id.* ¶ 327. Despite the significant reliance on "consistent hashing" in MediaPointe's expert's report, MediaPointe did not mention "consistent hashing" even a single time in its FICs, and MediaPointe does not attempt to show otherwise. *See* Dkt. 135-3 [FICs] at 22-29 (addressing claim 1[d]).

MediaPointe attempts to connect its new "consistent hashing" allegation to its FICs, but this effort is belied by the fact that in its FICs, MediaPointe asserted that Akamai's GTM was the claimed management center. As discussed in Akamai's opening brief, consistent hashing is used in Akamai's CDN system to balance the load among edge servers and select edge servers that can receive and respond to requests for content. Mot. at 9 n.4. Akamai's GTM is separate from its CDN system and does not use edge servers, and GTM therefore does not use "consistent hashing" at all. *See* Reply Ex. 11 [Nygren Dep. Tr.] at 203:21-24 ("Q. To what extent, if any, is Akamai's GTM used to deliver content through Akamai's CDN? A. Akamai's GTM product is not used to return Akamai Edge server IPs."). MediaPointe did not attempt to accuse "consistent hashing" of meeting claim 1[d] until it switched from its infringement theory in its FICs (based on GTM) to its new theory in its expert's report (based on Mapper). *See* Dkt. 135-3 [FICs] at 22-29.

Moreover, MediaPointe's attempt to justify its new reliance on "consistent hashing" is based on just a single reference to a "popularity score" in MediaPointe's FICs for claim 1[d], along with MediaPointe's assertion that this "popularity score" is related to "consistent hashing." Opp. at 14-15. But this is simply not true. MediaPointe's "popularity score" allegations were unrelated to "consistent hashing." In its FICs, MediaPointe asserted that Akamai's system determines a "popularity score" for specific media content based on how often that content is requested from a given server's cache memory (called a "cache hit"). *E.g.*, Dkt. 135-3 [FICs] at 28 ("Cache entries can also be associated with a popularity score. This happens when a client accesses a cache entry after the code determines it as a cache hit"). MediaPointe thus appeared to allege that by purportedly tracking what media

content has a cache hit in different servers, Akamai's system could then direct other clients to the same edge server that had a cache hit for the same content. *Id.*[3]

Akamai's "consistent hashing" technology is an entirely different feature. It operates in a fundamentally different way than the alleged "popularity" feature that MediaPointe relied on in its FICs because it does not depend on specific content requested by an end user client or the popularity of any specific content. As Dr. James Kurose explained in his rebuttal report, consistent hashing is "a load balancing technique" for selecting "edge servers within a region in a manner that ensures that the edge servers in the region do not become overloaded." Dkt. 148-8 [Kurose Rebuttal Report] ¶ 68. As unrebutted evidence confirms, "consistent hashing" is not based on specific content requested by an end user client, and it is therefore unlike the alleged popularity score referenced in MediaPointe's FICs. Reply Ex. 11 [Nygren Dep. Tr.] 202:17-23 ("Q. Does the consistent hashing algorithm use the specific content requested by an end user to pick an Edge server? A. No, it does not."). In fact, while MediaPointe's expert discusses an Akamai "Popularity Distribution" feature and a purported "popularity score" in his analysis of claim 1[d] (Dkt. 135-4 [Rubin Opening Report] ¶¶ 220-21), he never asserts that "consistent hashing" is based on a popularity distribution or score (*see id.* ¶ 223). Instead, MediaPointe's expert merely asserts that Akamai uses "a load balancing algorithm combined with its consistent hashing to ensure that requests for media content are served by the optimal edge server in a particular region." *Id.* Accordingly,

---

[3] As Akamai's engineers explained in their depositions, however, that is not how Akamai's system works: [redacted]. *See* Reply Ex. 12 [Caro Dep. Tr.] at 170:3-16.

MediaPointe's attempt to connect Akamai's "consistent hashing" to the purported "popularity score" referenced in its FICs is nothing but belated and unsupported attorney argument.

**B. MediaPointe's Belated Disclosure of These Untimely Infringement Theories Is Improper and Prejudicial to Akamai**

MediaPointe ignores the impropriety of its untimely disclosures and the resulting prejudice to Akamai and asks the Court to do the same. MediaPointe had the documents and source code that it relies on for its new theories for months prior to filing its FICs and the close of fact discovery. That alone is sufficient to strike MediaPointe's improper and untimely new contentions. *See Facet Techs., LLC v. LifesSan, Inc.*, 2023 WL 5504954, at *2-*3 (C.D. Cal. June 7, 2023) ("The Court may strike supplemental contentions containing amendments made without good cause" and "[t]he Court need not consider the prejudice question absent a showing of diligence, though the Court may exercise its discretion to do so.").

MediaPointe's assertion that Akamai only raises "boilerplate assertion[s]" of prejudice is wrong. MediaPointe's failure to disclose its current infringement theory until after fact discovery had closed deprived Akamai of a full and fair opportunity to investigate MediaPointe's allegations and significantly cut short Akamai's ability to prepare its case. The prejudice in such circumstances is inherent. *See Finjan, Inc. v. Blue Coat Systems, Inc.*, 2015 WL 3640694, at *2-*5 (N.D. Cal. June 11, 2015) ("As this new [infringement] theory was identified for the first time after the close of fact discovery, prejudice to Defendant is inherent.").

Rather than engaging with or addressing the untimeliness of its new infringement contentions or the resulting prejudice to Akamai, MediaPointe attempts to shift the burden onto ***Akamai*** to identify "witnesses, documents, or additional discovery that it believes it would have sought" to address MediaPointe's new infringement theories. Opp. at 17. But it is not Akamai's burden to now show

how it would have handled discovery differently had MediaPointe followed the rules—*e.g.*, the questions it would have asked in depositions, the interrogatories it would have asked, or the defenses it would have raised—it is instead ***MediaPointe's burden*** to justify its untimely infringement contentions. But it has not and cannot do so. *Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*, 2013 WL 6185357, at *1 (N.D. Cal. Nov. 26, 2013) (granting motion to strike portions of infringement report because patentee "has not met its burden of showing said pins, and infringement theories based thereon, are effectively disclosed … in its infringement contentions.").

## III. CONCLUSION

Akamai respectfully requests that the Court grant Akamai's motion.

DATED: November 6, 2023

Respectfully submitted,

**WILMER CUTLER PICKERING HALE AND DORR LLP**

By: /s/ *Michael J. Summersgill*

Michael J. Summersgill (pro hac vice)
michael.summersgill@wilmerhale.com
Alicia M. Coneys (pro hac vice)
alicia.coneys@wilmerhale.com
WILMER CUTLER PICKERING HALE AND DORR LLP
60 State Street
Boston, Massachusetts 02109
Telephone: (617) 526-6000

Arthur W. Coviello (SBN 291226)
arthur.coviello@wilmerhale.com
WILMER CUTLER PICKERING HALE AND DORR LLP
2600 El Camino Real, Suite 400
Palo Alto, California 94306
Telephone: (650) 858-6069

Jason F. Choy (SBN 277583)
jason.choy@wilmerhale.com
WILMER CUTLER PICKERING HALE AND DORR LLP
350 South Grand Avenue, Suite 2400
Los Angeles, California 90071
Telephone: (213) 443-5300

Kelly A. Todd (pro hac vice)
kelly.todd@wilmerhale.com
WILMER CUTLER PICKERING HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
Telephone: (212) 230-8800

*Attorneys for Plaintiff and Counterclaim-Defendant Akamai Technologies, Inc.*

## LOCAL RULE 11-6.2 CERTIFICATE OF COMPLIANCE

The undersigned, counsel of record for Plaintiff and Counterclaim-Defendant Akamai Technologies, Inc., certifies that this brief contains 2,926 words, which complies with the word limit of L.R. 11-6.1.

DATED: November 6, 2023

Respectfully submitted,

**WILMER CUTLER PICKERING HALE AND DORR LLP**

By: /s/ *Michael J. Summersgill*

Michael J. Summersgill (pro hac vice)
michael.summersgill@wilmerhale.com
Alicia M. Coneys (pro hac vice)
alicia.coneys@wilmerhale.com
WILMER CUTLER PICKERING HALE AND DORR LLP
60 State Street
Boston, Massachusetts 02109
Telephone: (617) 526-6000

Arthur W. Coviello (SBN 291226)
arthur.coviello@wilmerhale.com
WILMER CUTLER PICKERING HALE AND DORR LLP
2600 El Camino Real, Suite 400
Palo Alto, California 94306
Telephone: (650) 858-6069

Jason F. Choy (SBN 277583)
jason.choy@wilmerhale.com
WILMER CUTLER PICKERING HALE AND DORR LLP
350 South Grand Avenue, Suite 2400
Los Angeles, California 90071
Telephone: (213) 443-5300

Kelly A. Todd (pro hac vice)
kelly.todd@wilmerhale.com

WILMER CUTLER PICKERING
HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
Telephone: (212) 230-8800

*Attorneys for Plaintiff and Counterclaim-Defendant Akamai Technologies, Inc.*

**ATTESTATION**

I, Arthur W. Coviello, attest that all other signatures listed, and on whose behalf the filing is submitted, concur in the filing's contents and have authorized the filing.

DATED: November 6, 2023

*/s/ Arthur W. Coviello*

Arthur W. Coviello (SBN 291226)
arthur.coviello@wilmerhale.com
WILMER CUTLER PICKERING
HALE AND DORR LLP
2600 El Camino Real, Suite 400
Palo Alto, California 94306
Telephone: (650) 858-6069