UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

AKAMAI TECHNOLOGIES, INC.,

Plaintiff,

v.

MEDIAPOINTE, INC. and AMHC, INC.,

Defendants.

Case No. 2:22-cv-06233-MCS (SHKx)

**ORDER GRANTING AKAMAI'S MOTION TO STRIKE UNDISCLOSED INFRINGEMENT THEORIES FROM DR. AVIEL RUBIN'S OPENING EXPERT REPORT [ECF NO. 136]**

Plaintiff Akamai Technologies, Inc. ("Akamai") brought this action against Defendants MediaPointe, Inc. and AMHC, Inc. ("MediaPointe") seeking declaratory judgments that it does not infringe U.S. Patents No. 8,559,426 (the "'426 Patent") and 9,426,195 ("the '195 Patent") and that the patents are invalid. *See* Complaint, ECF No. 1; "FAC," ECF No. 29. MediaPointe filed counterclaims for infringement. *See* MediaPointe's Counterclaims, ECF No. 36; MediaPointe's First Amended Counterclaims, ECF No. 45. Akamai now moves to strike allegedly undisclosed infringement contentions from Dr. Rubin's Opening Expert Report. ("Motion," ECF Nos. 136, 135-1 (sealed).) MediaPointe filed an opposition. ("Opp'n," ECF Nos. 149, 154-1 (sealed).) Akamai filed a reply. ("Reply," ECF Nos. 167, 166-1 (sealed).) The Court held a hearing on November 20, 2023. For the following reasons, the Court

**GRANTS** Akamai's Motion.

## II. BACKGROUND

MediaPointe served its Final Infringement Contentions ("FICs," ECF No. 135-3) on June 22, 2023. Fact discovery closed on July 28, 2023. *See* ECF No. 56. MediaPointe served the opening report of its technical expert, Dr. Rubin, on August 21, 2023. ("Rubin Report, ECF No. 135-4.)

The '195 Patent claims:

1. A method comprising:

receiving an initial request for media content from a first client, the request being received by ***a management center***;

directing the first client to a node that is selected to relay a content stream from a content provider to the first client by using a mapping engine that maps trace routes between ***the management center***, the node, and the first client, the first client being directed to the node ***by the management center***;

relaying the content stream from the content provider to the first client via the selected node;

replicating the content stream for other clients during the relaying of the content stream at the selected node, in response to subsequent requests for the media content from the other clients, the other clients connected to the selected node based on an identification that the selected node is already relaying the content stream from the content provider to the first client; and

transmitting the replicated content stream from the selected node to at least one other client in response to the subsequent requests for the media content.

'195 Patent, Claim 1 (emphasis added to show limitations at issue).

In its FICs, MediaPointe disclosed that, "Akamai's Global Traffic Management

(‘GTM’) functions as the management center.” FICs at 4. MediaPointe further disclosed that, “GTM uses the MapMaker as a ‘mapping engine’ to map GeoTrees (i.e., ‘trace routes’) between the node (Akamai’s Ghost or edge servers) and the client requesting the stream” and GTM ultimately directs the client, using its GeoTrees, LLMaps, and IP Ping Maps, to a specific node that will relay the requested content stream.” *Id*. at 15–16. MediaPointe also disclosed, “ [w]hen receiving a request from a client for streamed content, the Akamai GTM directs its Ghost edge servers (i.e., ‘the selected node[s]’) to check their caches (i.e., ‘an identification that the selected node is already relaying the content stream from the content provider’) to see if that particular content stream has already been requested by a previous client (i.e., ‘the first client’).” *Id.* at 29.

In his Opening Expert Report, Dr. Rubin opined that he does not consider GTM an infringing product based on his understanding that GTM is not a content delivery product. Rubin Report ¶ 112, n.9. Dr. Rubin instead opined that “Akamai’s mapping system, known as ‘Mapper,’ receives the request for content” and “serves as the ‘management center’ in Akamai’s platform.” *Id.* ¶ 167. He further opined that, “[t]he request for content is initiated by a DNS query,” “[i]n mapping trace routes to the ‘client,’ Akamai specifically maps traceroutes to the client’s DNS resolver,” sometimes “us[ing] EDNS0-client-subnet information.” Id. ¶¶ 178–183. He also opined that, “[u]pon receiving a subsequent client request for a continuous stream of data, Akamai’s Mapper will identify and confirm if a node is already relaying the continuous stream of data,” and discussed “Akamai’s ‘consistent hashing’ caching protocol.” *Id*. ¶¶ 220, 223, 327. Dr. Rubin acknowledged that he previously approved the allegation in MediaPointe’s FICs that the GTM is the management center even though he no longer contends the GTM is the management center. Deposition of Aviel Rubin (“Rubin Dep.,” ECF No. 135-5) at 267:9–20. MediaPointe’s FICs never disclosed Akamai’s Mapper.

## II. LEGAL STANDARDS

In patent cases, courts often require the parties to exchange infringement and invalidity contentions “to provide early notice of their infringement and invalidity”

theories. *O2 Micro Int'l Ltd. v. Monolithic Power Sys., Inc.*, 467 F.3d 1355, 1365–66 (Fed. Cir. 2006). Requiring the exchange of contentions is "designed [to] make the parties more efficient, to streamline the litigation process, and to articulate with specificity" infringement and invalidity theories. *Intertrust Techs. Corp. v. Microsoft Corp.*, No. 01-CV-1640-SBA, 2003 WL 23120174, at *2 (N.D. Cal. Dec. 1, 2003).[1] Infringement contentions must identify where each element of each asserted claim is found within each accused product. *Id.* at *1–2. "[C]ourts agree that the degree of specificity" required is enough "to provide reasonable notice" to the opposing party." *Geovector Corporation v. Samsung Electronics Co. Ltd.*, No. 16-cv-02463-WHO, 2017 WL 76950, at *3 (N.D. Cal. Jan. 9, 2017).

Courts may strike expert testimony regarding infringement theories not timely or sufficiently disclosed in a party's infringement contentions. *See B-K Lighting, Inc. v. Vision3 Lighting*, 930 F. Supp. 2d 1102, 1137 (C.D. Cal. 2013). "The dispositive inquiry in a motion to strike is [] whether the allegedly undisclosed 'theory' is in fact a new theory or new element of the accused product alleged to practice a particular claim that was not previously identified in the plaintiff's contentions, or whether the 'theory' is instead the identification of additional evidentiary proof showing that the accused element did in fact practice the limitation." *Finjan, Inc. v. Blue Coat Sys., Inc.*, No. 13-CV-03999-BLF, 2015 WL 3640694, at *2 (N.D. Cal. June 11, 2015); *see also Digital Reg of Texas, LLC v. Adobe Sys. Inc.*, No. CV 12-01971-CW (KAW), 2014 WL 1653131, at *2 (N.D. Cal. Apr. 24, 2014) ("The threshold question in deciding whether to strike an expert report is whether the expert has permissibly specified the application of a disclosed theory or impermissibly substituted a new theory altogether.")

---

[1] Although the Court has not formally adopted the Northern District of California's Patent Local Rules, the Court finds those rules both consistent with the Rule 26 notice and good cause requirements and helpful, in the context of evaluating the sufficiency of infringement and invalidity contentions. Accordingly, the Court will consider caselaw applying those and other similar patent local rules.

The party asserting infringement may not use expert testimony regarding an untimely disclosed infringement theory "unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1). Courts consider several factors: "(1) the surprise to the party against whom the evidence would be offered; (2) the ability of that party to cure the surprise; (3) the extent to which allowing the evidence would disrupt the trial; (4) the importance of the evidence[;] and (5) the nondisclosing party's explanation for it[s] failure to disclose the evidence." *Dey L.P. v. Ivax Pharms., Inc.*, 233 F.R.D. 567, 571 (C.D. Cal. 2005) (citing *S. States Rack & Fixture, Inc. v. Sherwin-Williams Co.*, 318 F.3d 592, 597 (4th Cir. 2003)). The party facing sanctions bears the burden to prove harmlessness. *Merchant v. Corizon Health, Inc.*, 993 F.3d 733, 741 (9th Cir. 2021).

## III. DISCUSSION

### A. The Parties' Positions

Akamai argues that MediaPointe untimely offered new infringement theories by substituting GTM for the Mapper in Dr. Rubin's report. Memo at 16. Akamai argues these new theories affect MediaPointe's infringement allegations with respect to the "request for media content . . . being received by a management center," "a mapping engine that maps trace routes between the management center, the node, and the first client," and "based on an identification that the selected node is already relaying the content stream from the content provider to the first client" limitations. *Id.* at 16–18; '195 Patent, Claim 1.

MediaPointe argues that its contentions provide adequate notice that the Mapper is the management center because the FICs disclose "a mapping system [that] collects information about the state of the Akamai network and locates the caching server that can serve the content." Opp'n at 12–13. MediaPointe further agues that in preparing its FICs, MediaPointe simply confused GTM with the Mapper but cited to Mapper source code all along. *Id*. at 13. For these reasons, MediaPointe argues any deficiencies in its FICs are harmless. *See id*. at 19.

In its Reply, Akamai argues that the Mapper and GTM are fundamentally

different; the "Mapper system is part of Akamai's content delivery network ("CDN") technology which uses Akamai edge servers to deliver content to individual users. By Contrast, GTM is a fundamentally product that assists corporate customers in managing their datacenters without the use of Akamai edge servers." Reply at 4. Akamai further argues that Dr. Rubin's report discusses different source code, components, and functionalities from the FICs. *See id*. at 4–5.

**B. Analysis of FICs and Dr. Rubin's Report**

i. The "Management Center"

First, disclosure of "a mapping center" in the FICs does not fulfill MediaPointe's notice obligations. The "mapping center" disclosure communicates at a high level that the accused products have a functionality that allegedly performs the limitations at issue including, for example, receiving content requests and mapping trace routes. However, this kind of disclosure does not identify any specific functionalities in connection with any specific claim elements. At the contention stage, the party asserting infringement must identify where each element of each asserted claim is found within each accused product, sufficient to provide notice of its theories to the accused infringer. *See Intertrust Techs. Corp.*, 2003 WL 23120174, at *1–2. Thus, the generalized "mapping center" disclosure does not provide adequate support for Dr. Rubin's identification of the Mapper, a specific system having its own source code within Akamai's accused CDN product. Additionally, the FICs actually identified a different functionality, GTM, instead of the Mapper. Identification of a "new element of the accused product" warrants exclusion. *See Finjan, Inc.*, 2015 WL 3640694, at *2.

Second, MediaPointe's argument that the source code disclosure for the Mapper and GTM are the same appears incorrect. MediaPointe indicates it cited Mapper source code in its FICs, mistaking these files for GTM source code. Opp'n at 13–14. The source code cited in the FICs includes ip_ping_map.h, mapMaker.h/cc, RadixTree, Maprule.h/cc, GeoTree.h/cc, PingPointMeasure.h/cc, CandidateSet.h/cc, cmr_guide.txt, CMS.h/cc, and ScoringData.h/cc. FICs at 11–12 and 14. Dr. Rubin does

not cite or discuss *any* of these files in disclosing his new, Mapper-based infringement theory. *See* Rubin Report ¶¶ 171–202. It is unclear how MediaPointe's identification of source code in its FICs, which it no longer replies upon, would adequately inform Akamai of MediaPointe's infringement theories, especially given the substitution of GTM for Mapper.

For these reasons, the Courts finds the late disclosure of the Mapper as the management center, in lieu of GTM, untimely.

ii. The "Request for Content"

In its Reply, Akamai does not dispute that MediaPointe disclosed DNS queries in both its FICs and in Dr. Rubin's Report. Reply at 7. Rather, Akamai argues that a DNS server within the context of GTM different from a DNS server within the context of the Mapper. *Id.* As discussed above, the Court finds disclosure of the Mapper untimely. The Court does not separately consider Dr. Rubin's opinion that a DNS query forms part of, but not the entirety of, the request for content. The Court instead addresses that issue in its ruling on Akamai's Motion for Summary Judgment of Noninfringement (ECF No. 133). The Court excludes this testimony due to the Mapper issue, discussed above.

iii. DNS Resolver and EDNS0-client-subnet information

MediaPointe did not identify either the DNS Resolver or EDNS0-client-subnet information in its FICs. Dr. Rubin now opines that, "[t]he DNS resolver then communicates with the Akamai DNS server, . . . which is part of the "mapping system [that] collects information about the state of the Akamai network and locates the caching server that can serve the content." Rubin Report ¶ 168. MediaPointe contends identification of the DNS Resolver or EDNS0-client-subnet information merely provides evidence of Akamai's trace route mapping in the accused products. Opp'n at 17. The disclosures in the FICs do not adequately support Dr. Rubin's testimony. Again, MediaPointe should have identified where each element of each asserted claim is found with the accused product in its FICs. *See Intertrust Techs. Corp.*, 2003 WL 23120174,

at *1–2. Late disclosure of the DNS Resolver, coupled with late disclosure the Mapper, amounts to a "new element of the accused product" and warrants exclusion. *See Finjan, Inc.*, 2015 WL 3640694, at *2.

iv. Consistent Hashing

The Court agrees with MediaPointe that it disclosed use of a popularity score to identify selected edge servers to relay the content stream in both its FICs and Dr. Rubin's Report. *See* FICs at 28; Rubin Report ¶ 221. MediaPointe contends that consistent hashing is simply the name of the algorithm that uses the popularity score within the accused products; therefore, identification of consistent hashing does not constitute a new element. Opp'n at 18. The Court finds MediaPointe understates the role of consistent hashing in Dr. Rubin's Report. MediaPointe does not simply put a name to a previously described functionality. Rather, Dr. Rubin attributes 50% of use of the accused products as infringing based on use of consistent hashing. Rubin Report ¶ 327. Moreover, MediaPointe offered its previous disclosure regarding the popularity score assuming GTM served as the management center. MediaPointe now substitutes GTM with Mapper. Accordingly, late disclosure of consistent hashing, coupled with late disclosure of the Mapper, warrants exclusion.

For the foregoing reasons, the Court finds Dr. Rubin's identification of the Mapper as the management center, in lieu of GTM, untimely.

**C. Substantial Justification and Harmlessness**

The Court next considers whether MediaPointe's untimely disclosures were substantially justified and harmless, consistent with Rule 37. As a threshold matter, some courts do not require a showing of prejudice to strike an expert report disclosing new infringement theories and instead find "prejudice [] inherent in the assertion of a new theory after discovery has closed." *Finjan, Inc.*, 2015 WL 3640694, *2 (citing *Adobe Sys. Inc. v. Wowza Media Sys.*, No. 11-CV-02243-JST, 2014 WL 709865, at *15 n.7 (N.D. Cal. Feb. 23, 2014). Thus, the Court could choose to strike Dr. Rubin's report without considering substantial justification and harmlessness. Still, the Court finds

MediaPointe's late disclosure lacks substantial justification and caused Akamai harm.

First, MediaPointe does not cite any reason for its failure to earlier identify the Mapper as the management center. Akamai indicates MediaPointe had all relevant documents several months prior and in fact MediaPointe itself claims to have cited Mapper source codes in its FICs. *See* Memo at 13–15 and 18–19; Opp'n at 13. Akamai also served an interrogatory response indicating that it felt MediaPointe's identification of GTM was not correct. Memo at 19. MediaPointe did not amend its contentions or otherwise disclose an alternative infringement theory. For these reasons, the Court cannot find MediaPointe's failure substantially justified.

As to harm, Akamai indicates it underwent discovery for a period of eight months under the assumption that MediaPointe contended the external GTM was the management center. Memo at 5. MediaPointe argues there is no harm because the FICs and Dr. Rubin's report both cite Mapper source code. Opp'n at 19–20. However, as discussed above, Dr. Rubin does not rely upon the source code MediaPointe identified in its FICs and instead cites different files. *See* § III.B.i, *supra.* The late identification of new accused functionalities, different from MediaPointe's contentions, likely affected Akamai's identification of prior art references and its invalidity contentions. As to infringement, it also may have left Akamai unable to depose fact witnesses, in depth, about the relevant components. The Court cannot overlook these harms.

For the foregoing reasons, the Court finds exclusion of Dr. Rubin's testimony concerning the Mapper theory appropriate.

/ / /

/ / /

## IV. CONCLUSION

For the reasons stated above, the Court **GRANTS** Microsoft's motion.

**IT IS SO ORDERED.**

Dated: January 3, 2024

Mark C. Scarsi

MARK C. SCARSI
UNITED STATES DISTRICT JUDGE