UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

AKAMAI TECHNOLOGIES, INC.,

Plaintiff,

v.

MEDIAPOINTE, INC. and AMHC, INC.,

Defendants.

Case No. 2:22-cv-06233-MCS (SHKx)

**ORDER GRANTING AKAMAI'S MOTION FOR SUMMARY JUDGMENT OF NONINFRINGEMENT [ECF NO. 133]; ORDER FINDING MOTIONS TO STRIKE [ECF NOS. 132, 139] MOOT (SEALED)**

Plaintiff Akamai Technologies, Inc. ("Akamai") brought this action against Defendants MediaPointe, Inc. and AMHC, Inc. ("MediaPointe") seeking declaratory judgments that it does not infringe U.S. Patents No. 8,559,426 (the "'426 Patent") and 9,426,195 ("the '195 Patent") and that the patents are invalid. *See* Complaint, ECF No. 1; "FAC," ECF No. 29. MediaPointe filed counterclaims for infringement. *See* MediaPointe's Counterclaims, ECF No. 36; MediaPointe's First Amended Counterclaims, ECF No. 45. In its July 7, 2023 claim construction ruling, the Court found the claims of the '426 Patent invalid due to indefiniteness. *See* ECF No. 101 at 12–13, 14. Akamai's motion for summary judgment concerns only the '195 Patent.

Akamai moves for summary judgment of noninfringement. ("MSJ," ECF No. 133.) With its motion, Akamai filed a Memorandum in Support ("Memo," ECF Nos.

133-1, 131-1 (sealed)), a Statement of Uncontroverted Facts and Conclusions of Law ("SUF," ECF No. 133-2), a declaration ("Coviello Decl.," ECF No. 133-3), and several exhibits ("Akamai's Exs.," ECF Nos. 133-4–133-9, 131-2–131-3 (sealed)). MediaPointe filed an opposition ("Opp'n," ECF Nos. 152, 151-1 (sealed)), a declaration ("Liu Decl.," ECF No. 152-1), and several exhibits ("MP's Exs.," ECF Nos. 152-2–152-10 and 151-2–151-5 (sealed)).[1] Akamai then filed a reply ("Reply," ECF No. 164, 163-1 (sealed)), a declaration in support of its reply ("Second Coviello Decl.," ECF No. 164-1), a response to MediaPointe's Statement of Genuine Disputes of Material Facts ("RSUF," ECF Nos. 164-2, 163-2 (sealed)), and a response to MediaPointe's Additional Statement of Undisputed Facts ("RASUF," ECF No. 164-3). The Court held a hearing on November 20, 2023.[2] For the following reasons, the Court **GRANTS** Akamai's Motion for Summary Judgment.

The parties also filed two Motions to Strike. MediaPointe moves to strike and exclude testimony of Akamai's Experts Ms. Julie Davis and Dr. James Kurose. ECF No. 132. Akamai moves to exclude and/or strike opinions and testimony of Dr. Aviel Rubin and Mr. Robert Mills. ECF No. 139. The Court finds each of these motions **MOOT** in view of the noninfringement ruling.

## II. BACKGROUND

### A. The Accused Product

MediaPointe alleges that Akamai's Content Delivery Network ("CDN") System infringes claims 1, 3–4, and 6–7 of the '195 Patent. *See* RSUF ¶¶ 1–8. The Akamai

---

[1] MediaPointe filed its Statement of Genuine Disputed Fact ("GDF," ECF Nos. 152-2, 151-2 (sealed)) as Exhibit 1 to its Opp'n. MediaPointe filed its Additional Statement of Undisputed Facts ("ASUF," ECF No. 152-3) as Exhibit 2 to its Opp'n.

[2] The parties filed portions of their briefs and accompanying exhibits under seal. Within seven days of the issuance of this Order, the parties shall file a joint statement as to whether any material stated in this Order shall remain under seal as well as a proposed redacted version. The Court will then determine whether any portions of this Order will be redacted in the version filed on the public docket, with a corresponding, non-redacted version filed under seal.

CDN System includes a network of over 350,000 servers all over the world, including 120,000 servers in the Unites States. Opening Expert Report of Dr. Aviel Rubin ("Rubin Report," ECF No. 131-2 ¶ 185). Akamai's CDN System "includes top-level name servers, low-level name servers, and ghost edge servers." RSUF ¶ 8. Akamai's products use its mapping system, called Mapper, which includes Akamai Domain Name System ("DNS") servers. *See id*. ¶ 10. These DNS servers receive and respond to DNS queries. *Id*. ¶ 11.[3] MediaPointe's technical expert, Dr. Rubin, opined that a DNS query, alone, is not a "request for content" within the meaning of the '195 Patent and "does not itself identify the specific content." *Id*. ¶¶ 13–14. Edge servers receive requests for content. *Id.* ¶ 15. Mapper does not receive an HTTP request for content. *Id.* ¶ 16.

**B. The '195 Patent**

The'195 Patent, entitled, "System and Method for Distribution of Data Packets Utilizing an Intelligent Distribution Network" claims priority to an Australian provisional patent application filed January 11, 2000. *See generally*, '195 Patent. It teaches improved systems and methods for distributing streaming media content to a large numbers of diversely located clients. *Id.*, Abstract. Specifically, it discloses an intelligent distribution network ("IDN") having a management center and one or more nodes. *See id*. at 3:25-36. The management center is a mapping engine that determines paths for requested content to follow on the network. *Id*. The nodes are points on the network that receive streams of data from content providers and then pass the data on to clients. *Id*. The management center evaluates potential routes between itself, the client, and the nodes, to determine the best route or routes to use to deliver requested content. *Id*. at 3:33–36. The potential routes provide relevant information such as travel

---

[3] MediaPointe does not dispute that the DNS servers receive and respond to DNS queries but does object "to the extent that Akamai implies that Akamai's Mapper's DNS servers receive and respond to DNS queries divorced from the context of a user's request for content." *Id.* The Court considers the context for the DNS queries in the analysis portion of this Order but does not find any dispute of fact here.

time. *See*, *id*. at 6:16–33 (latency). Using this information, the management center then identifies the optimal route or routes for the content delivery task. *See id*. at 3:33–36.

MediaPointe alleges that Akamai's Content Delivery Network ("CDN") System infringes claims 1, 3–4, and 6–7 of the '195 Patent. *See* RSUF ¶¶ 1–8. Claim 1 of the '195 Patent is exemplary and discloses:

> 1. A method comprising:
>
> a management center,
>
> ***receiving an initial request for media content from a first client, the request being received by a management center***;
>
> directing the first client to a node that is selected to relay a content stream from a content provider to the first client by using a mapping engine that maps trace routes between the management center, the node, and the first client, the first client being directed to the node by the management center;
>
> relaying the content stream from the content provider of the first client via the selected node;
>
> replicating the content stream for other clients during the relaying of the content stream at the selected node, in response to subsequent requests for the media content from the other clients, the other clients connected to the selected node based on an identification that the selected node is already relaying the content stream form the content provider to the first client; and
>
> transmitting the replicated content stream from the selected node to at least one other client in response to the subsequent requests for the media content.

'195 Patent, Claim 1 (emphasis added to show limitation at issue).

## III. LEGAL STANDARDS

### A. Motion for Summary Judgment

Summary judgment is appropriate where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 330 (1986). A fact is material when, under the governing law, the resolution of that fact might affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id*. The burden of establishing the absence of a genuine issue of material fact lies with the moving party, *see Celotex*, 477 U.S. at 322–23, and the court must view the facts and draw reasonable inferences in the light most favorable to the nonmoving party, *Scott v. Harris*, 550 U.S. 372, 378 (2007).

To meet its burden, "[t]he moving party may produce evidence negating an essential element of the nonmoving party's case, or, after suitable discovery, the moving party may show that the nonmoving party does not have enough evidence of an essential element of its claim or defense to carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1106 (9th Cir. 2000). Once the moving party satisfies its burden, the nonmoving party cannot simply rest on the pleadings or argue that any disagreement or "metaphysical doubt" about a material issue of fact precludes summary judgment. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). There is no genuine issue for trial where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party. *Id*. at 587.

**B. Infringement**

Determining patent infringement is a two-step process. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 976 (Fed. Cir. 1995). The first step is to construe the claims; i.e., to determine the scope and meaning of what is allegedly infringed. *Id*. This step is a question of law. *Id*. at 970–71. The second step is to compare the properly construed claims to the accused product to determine whether each of the claim limitations is met, either literally or under the doctrine of equivalents. *Id*. at 976; *CCS*

*Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1365 (Fed. Cir. 2002); *Tex. Instruments Inc. v. U.S. Int'l Trade Comm'n*, 988 F.2d 1165, 1173 (Fed. Cir. 1993) (although no literal infringement of a claim, an accused device may still infringe under the doctrine of equivalents.). This determination is a question of fact. *Bai v. L &L Wings Inc.*, 160 F.3d 1350, 1353 (Fed. Cir. 1998); *Schoell v. Regal Marine Indus., Inc.*, 247 F.3d 1202, 1207 (Fed. Cir. 2001).

Because the ultimate burden of proving infringement rests with the patentee, an accused infringer may establish that summary judgment is proper "either by providing evidence that would preclude a finding of infringement, or by showing that the evidence on file fails to establish a material issue of fact essential to the patentee's case." *Novartis Corp. v. Ben Venue Labs., Inc.*, 271 F.3d 1043, 1046 (Fed. Cir. 2001). The absence of one claim element establishes non-infringement and makes immaterial whether there are issues of fact as to the absence or presence of other claim limitations. *Laitram Corp. v. Rexnord, Inc.*, 939 F.2d 1533, 1535 (Fed. Cir. 1991). If the moving party meets this initial requirement, the burden shifts to the party asserting infringement to set forth, by declaration or as otherwise permitted under Fed. R. Civ. P. 56, "specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 248.

**C. Expert Testimony**

Rule 702 governs the admissibility of expert testimony. "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise." Fed. R. Evid. 702. Testimony must be "based upon sufficient facts or data" and be "the product of reliable principles and methods." *Id*. Further, the expert witness must have "applied the principles and methods reliably to the facts of the case." *Id*. The Supreme Court has imposed a "gatekeeping responsibility" for courts to engage in objective screening to ensure that evidence "is not only relevant, but reliable." *Daubert v. Merrell Dow Pharms.*, 509 U.S. 579, 589 (1993); *Kumho Tire Co. v. Carmichael*,

526 U.S. 137, 141–42 (1999) (clarifying the "gatekeeping" obligation "applies not only to testimony based on 'scientific knowledge,' but also to testimony based on 'technical' and 'other specialized' knowledge").

In Daubert, the Supreme Court outlined factors relevant to the reliability prong, including: (1) whether the theory can be and has been tested; (2) whether it has been subjected to peer review; (3) the known or potential rate of error; and (4) whether the theory or methodology employed is generally accepted in the relevant scientific community. 509 U.S. at 593–94. The Supreme Court emphasized the "flexible" nature of this inquiry. *Id*. at 594; *see also Kumho*, 526 U.S. at 141-42 ("Daubert's list of specific factors neither necessarily nor exclusively applies to all experts or in every case. Rather the law grants a district court the same broad latitude when it decides how to determine reliability as [the court] enjoys in respect to its ultimate reliability determination.") Indeed, a "trial court has broad latitude not only in determining whether an expert's testimony is reliable, but also in deciding how to determine the testimony's reliability." *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 982 (9th Cir. 2011) (citing *Kumho*, 526 U.S. at 152).

## IV. NONINFRINGEMENT DISCUSSION

### A. Effect of Ruling on Motion to Strike

The Court granted Akamai's Motion to Strike MediaPointe's Untimely Infringement Contentions from its Expert's Report (ECF No. 136). MediaPointe therefore cannot rely on Dr. Rubin's testimony that the Mapper serves as the claimed management center due to untimely disclosure. This leaves MediaPointe without any evidence that the Mapper meets the management center limitation and thus without any evidence to rebut Akamai's summary judgment motion. Due to this absence of evidence, the Court **GRANTS** Akamai's motion for summary judgment of noninfringement. Still, in an abundance of caution, the Court also considers the merits of MediaPointe's argument, as discussed below.

### B. The "*request for media content*" Limitation

i. The Parties' Positions

Akamai argues its CDN system does not infringe because the accused Mapper does not receive a "request for media content" within the meaning of the '195 Patent. Memo at 10. MediaPointe alleges that the Mapper serves as the claimed "management center." To infringe, the accused "management center," must receive "an initial request for media content from a first client." '195 Patent, Claim 1. Akamai argues that MediaPointe's evidence shows only that the Mapper receives DNS queries and that these queries are not requests for media content. Memo at 10. Rather, within the accused products, only edge servers receive media content requests. *Id.* at 11. MediaPointe identifies these edge servers as the claimed nodes, not the claimed management center. *Id.* Finally, Akamai argues that Dr. Rubin identifies no source code in support of MediaPointe's contention that the Mapper receives content requests. *Id.* at 12.

MediaPointe argues that Akamai bases its noninfringement motion on an improper claim construction limiting the "request for media content" to an "HTTP request." Opp'n at 11. MediaPointe further argues that the evidence shows that within the accused products, a request for content at least begins with a DNS query. *Id.* at 15–19 (citing Akamai Technical Documents AK-MP_00013760 (ECF No. 152-10), AK-MP_00007688 (ECF No. 151-5), and AK-MP_00007572 (ECF No. 152-9)). Specifically, Dr. Rubin opines that an end user (client) initiates the "request for content" "by entering a URL in his or her browser, such as www.netflix.com." Rubin Report ¶ 166. The user initiated action "cause[s] a chain reaction of DNS messages" resulting in the request for content. Deposition of Dr. Aviel Rubin ("Rubin Dep.," ECF No. 151-4) at 210:8–211:3. MediaPointe's attorneys reason that the Mapper could not perform subsequent steps if it did not receive a request for content. Opp'n at 17.

Akamai replies that it does not contend the term "request for media content" should be limited to an "HTTP request." Reply at 5. Akamai then reiterates its position that (1) the evidence shows only that the Mapper receives DNS queries and (2) by Dr. Rubin's own admission, the DNS queries, alone, do not comprise the request for media

content within the meaning of the ’195 Patent. *Id.* at 4. Therefore, MediaPointe presents insufficient evidence to show that the Mapper (alleged management center) receives a request for media content, as required by the claims. *Id.* at 4–5.

ii. Analysis

As a threshold matter, Akamai’s motion does not raise a claim construction issue and does not turn on claim construction. Akamai does not argue that the request for media content must be limited only to an HTTP request. Reply at 5. Rather, Akamai argues that the available evidence shows only that Mapper receives a DNS query and that the DNS query, alone, cannot be the request for media content. *Id.* For these reasons, the Court disregards MediaPointe’s claim construction arguments. The Court instead considers only whether the evidence MediaPointe cites is sufficient to show the accused products meet the “request for content” limitation. For the reasons discussed more fully below, the evidence is not sufficient to create a fact issue.

Here, Akamai identifies evidence showing that edge servers, but not Mapper, receive requests for media content in the accused products. Claim 1 requires that “the management center” “receiv[e] an initial request for media content from a first client.” ’195 Patent, Claim 1. The record establishes that Akamai’s Mapper includes DNS servers and that these DNS servers “merely receive DNS [] quer[ies].” Rubin Dep. 173:24–174:1, 208:16–20. In other words, no evidence shows that the DNS servers, and thus Mapper, receive some other type of information that could comprise a request for media content. The record also establishes that the DNS queries, alone, cannot be the requests for media content within the meaning of the ’195 Patent. *Id.* at 174:2–5 (A “DNS query itself is not the request for content described in the ’195 patent.”); *see also* 200:5–9 (“[T]he [DNS] query itself does not identify the specific content.”)

Next, the record shows that only edge servers in the accused products receive HTTP requests, which Akamai suggests could be the requests for media content. *Id.* 209:25–210:3. Akamai does not argue that the requests for media content are limited to only HTTP requests. Rather, as discussed above, the record evidence does not identify

anything else that could meet the limitation. MediaPointe contends that the edge servers are nodes within the meaning of the '195 Patent and that the Mapper is the management center. MediaPointe's expert confirms that the Mapper does not receive an HTTP request. *Id.* at 217:22–25. Again, the management center (not the nodes) must receive the request to meet the limitation.

Therefore, Akamai sufficiently demonstrates an absence of evidence of infringement of the "request for media content" limitation. The burden then shifts to MediaPointe to prove otherwise. *See Matsushita Elec. Indus.*, 475 U.S. at 586.

MediaPointe relies primarily on Dr. Rubin's testimony discussing several technical documents. Dr. Rubin opines that the request for content is a user-initiated action and occurs "[w]hen the user types a URL into his/her browser [and then] the domain name of the URL is translated by the mapping system into the IP address of an edge server to serve the content." Rubin Report ¶ 166; *see also* Rubin Dep. at 211:16-212:14. He clarifies that the DNS "query is part of the [user's] request for content, but the DNS query itself is not the request for content described in the '195 Patent." *Id.* ¶ 135. A user issues a DNS query to a resolver, beginning the request. *Id.* ¶ 168. The DNS resolver communicates with a DNS server. *Id*. The DNS servers are part of the mapping system. *Id*. In this way, Dr. Rubin contends the Mapper receives the request for content, consistent with the '195 Patent. *Id.* ¶ 167; *see also* '195 Patent, Claim 1 (claiming "the management center" "receiv[es] an initial request for media content from a first client").

In forming his opinion, Dr. Rubin relies on several technical documents. AK-MP_00013760 (ECF No. 152-10), titled "Flow of the Akamai CDN," includes a diagram with a client, DNS server, and edge server. The client requests content and the DNS server redirects or re-routes the request to the edge server:




The document does not provide any further detail regarding the nature of the client request, i.e., whether the request is a DNS query or something else.

AK-MP_00007688 (ECF No. 151-5) explains at a high level that the "Mapper's job is to match a request for content with the best edgeserver to handle that request." It does not disclose that the Mapper receives a request for content from the client. It does not provide any detail regarding how the Mapper matches a request for content with an edge server. AK-MP_00007572 (ECF No. 152-9), titled "Algorithmic Nuggets in Content Delivery," establishes that the request for content at least begins with the DNS query.

The record evidence establishes, at most, that the DNS server, which is part of the Mapper, receives a DNS query. This is insufficient to create a fact issue because Dr. Rubin opines that the DNS query, alone, cannot be the request for media content. Rubin Report ¶ 135. First, MediaPointe cannot rely on the Mapper as the management engine

in view of the ruling on Akamai's motion to strike. Second, even if MediaPointe could rely on the Mapper, it is not clear what else the request for content would be, if not the DNS query. MediaPointe appears to contend the request is the user-action of typing in the URL but does not cite any evidence explaining, in detail, what that action would include. For instance, would it trigger a DNS query and something else? What would the "something else" be? Could the "something else" meet the claim limitation? Third, the evidence shows that the DNS servers cannot receive "something else." The DNS Server merely receives a DNS query. *See* Rubin Dep. at 173:24–174:1, 208:16–20. The evidence shows only that the DNS server (Mapper) receives the request. MediaPointe does not identify any other component in the Mapper that could receive the request.

In sum, if the DNS server has to receive the request to meet the limitation, and the DNS query cannot, alone, be the request, but the DNS server only receives a DNS query, the accused products cannot infringe in the way MediaPointe contends.

## V. MOTIONS TO STRIKE

### A. MediaPointe's Motion to Strike and Exclude Testimony of Akamai's Experts Ms. Julie Davis and Dr. James Kurose (ECF No. 132)

Ms. Davis' challenged testimony concerns valuations of the technology claimed in the '195 Patent. Dr. Kurose's challenged testimony concerns technical analysis supporting Ms. Davis' apportionment and other damages opinions. MediaPointe's Motion is **MOOT** because this testimony relates solely to patent damages and because the Court grants Akamai's Motion for Summary Judgment of Non-infringement.

### B. Akamai's Motion to Exclude and/or Strike Improper Opinions and Testimony of Dr. Aviel Rubin and Mr. Robert Mills (ECF No. 139)

Mr. Mills and Dr. Rubin's challenged testimony relates entirely to patent damages. Therefore, as discussed above with respect to Ms. Davis and Dr. Kurose, the Motion is **MOOT** in view of the Court's noninfringement finding.

/ / /

/ / /

## VI. CONCLUSION

For the reasons stated above, the Court **GRANTS** Akamai's motion.

**IT IS SO ORDERED.**

Dated: January 3, 2024

MARK C. SCARSI
UNITED STATES DISTRICT JUDGE